# WALKER v. WABASH RAILROAD COMPANY, Appellant.

### Division One, February 22, 1906.

1. **JURISDICTION: Federal Court.** Complaints that a Federal
court erred in handing over to the State court jurisdiction of
a cause, when the point of diverse citizenship was presented to
it, should be made in the Federal court. When the Federal
court has once decided that it has no jurisdiction and remands
the cause to the State court, the State court will not thereafter
examine into or sit in judgment upon the wisdom or grounds of
the Federal court's determination of the question.

2. **RAILROAD: Whistling Post: Rebuttal.** Where the defendant
railroad put in evidence that the signal was given at the whist-
ling post, it is proper to permit plaintiff to show in rebuttal that
the whistling post was more than 80 rods from the crossing.

3. ———: ———: ———: **Pleading.** Nor is it necessary for
plaintiff to plead that the whistling post was not at the proper
place. That is not a constitutive element in his cause of action
which lays the injuries to a traveler in crossing the track to the
railroad's failure to sound the whistle at least 80 rods from the
crossing. The whistling must be done at the place designated,
not by the post, but by the statute.

Walker v. Railroad.

4. ——: ——: ——: **Surrebuttal: Rules of Company.** Evidence of what were the rules of the railroad company in reference to whistling for a road crossing is not competent as surrebuttal, unless they tend to show that the whistling post was at the proper place. The statute requiring the signal to be given at least 80 rods from the crossing, and not the rules of the company, control.

5. **PLEADING:  Amendment:  Departure:  Appellate  Practice.** By failing to produce in the appellate court the order of the trial court overruling the motion to strike out the amended petition, and answering over, appellant waives all right to complain of any departure.

6. ——: ——: ——: **Reply: Answering over.** Defendant by answering over waives any departure in the amended petition, and his motion, thereafter filed, to strike out a part of the reply, unless the new matter set up in the reply constitutes an amendment to the original petition not permitted in a reply, should be overruled.

7. ——: ——: ——: **Original Petition.** Matter pleaded in the reply must be measured by reference to the amended petition, and not by reference therein to the original or abandoned petition, for such reference, in considering the naked question of departure, is neither pertinent nor impertinent.

8. ——: ——: ——: **Answer: Demurrer to Evidence.** But the point that plaintiff's cause of action is barred by the Statute of Limitations, as shown by his amended petition changing the name of the minor killed by the accident, may be preserved by setting up such plea in the answer, as well as by demurrer to the evidence, or by a peremptory instruction asked by appellant.

9. **PLEADING:  Wrong Name.** The name of a party to a suit or of a party killed by an accident, is but a means of identifying such party.

10. **LIMITATIONS:  Negligence:  Damages  for  Killing  Minor Child:  Suit by Wrong Name:  Amending Petition.** In the original petition plaintiff, a father, sued for damages for the negligent killing of his child by defendant railroad at a road crossing, and therein stated the child's name to be Elbert Walker. More than one year thereafter he filed an amended petition in which the child's name was stated to be Charles L. Walker, which was the true name of the child killed.    Defendant in its answer pleaded that the cause of action set up in the amended petition was barred by the one-year Statute of Limitations (sec. 2868, R. S. 1899.)   To this plaintiff replied that by error of the scrivener the name of Elbert Walker was inserted in the original petition, while in fact the true name was Charles L. Walker. The evidence showed that plaintiff had a step-son

named Elbert Peak, two years younger than Charles, and that Elbert was present at the accident, and that he was not killed. *Held*, that the amended petition did not set up a new cause of action, but a mere variation of an allegation affecting a demand already in issue, and hence the action was not barred by limitation.

11. **NEGLIGENCE: Concurring.** If negligence on the part of those in charge of a locomotive engine rapidly approaching a road crossing, concurs with that of an adult traveler about to cross, there can be no recovery for injury or death to the traveler.

12. ———: ———: **Crossing: No Signal: Looking and Listening: Question of Age.** The deceased, a boy fourteen years old, for several years preceding the accident, had hauled timber to coal mines near the railroad crossing. When he and his step-brother, two years younger, had unloaded the wagon and were ready to start home, plaintiff warned them that the regular passenger train was about due. They stopped about fifty feet from the crossing, looked and listened for the train, but neither saw nor heard it, and then proceeded slowly up the slightly-inclined grade to the track, looking in the opposite direction at some boys carrying fish, but at no time thereafter looking or listening for the train, which was coming at a very rapid rate, and did not discover it until it was too late for them to get across in safety. There was evidence that the whistle was not sounded within 80 rods of the crossing and that the bell was not kept ringing, and failure in that regard is the negligence relied upon by plaintiff. Deceased and his step-brother were not discovered by the engineer or fireman until it was too late to stop the train in time to avoid striking the wagon. *Held*, that, the case having been submitted to the jury on instructions asked by both sides that deceased was *sui juris*, it will be considered in this court on the same theory, and a verdict and judgment for plaintiff must be reversed, on account of concurring negligence. *Semble*, under the facts of this case, decedent was guilty of contributory negligence as a matter of law.

13. **Appellate Practice: Theory of Trial.** Where the case was tried on the theory that the injured party was *sui juris*, in that the instructions asked and given for both sides invoked of the deceased the care expected of persons of ordinary prudence, it will be disposed of on appeal on the same theory.

Appeal from Randolph Circuit Court.—*Hon John A. Hockaday*, Judge.

REVERSED.

*Geo. S. Grover* for appellant.

(1) The substituted cause of action was barred by the statute on May 5, 1903, at the time the amended petition was filed. Courtney v. Sheehy, 38 Mo. App. 290; Clemens v. Greenwell, 40 Mo. App. 589; Poor v. Watson, 92 Mo. App. 101; Case v. Cordell, 78 S. W. 62; Bricken v. Cross, 163 Mo. 449; Sec. 2868, R. S. 1899. (2) At the time of this accident Charles L. Walker was *sui juris.* Payne v. Railroad, 136 Mo. 562. (3) Upon the undisputed facts plaintiff was not entitled to recover upon his own testimony. Henze v. Railroad, 71 Mo. 636; Moberly v. Railroad, 98 Mo. 183; Hayden v. Railroad, 124 Mo. 566; Kelsay v. Railroad, 129 Mo. 362; Payne v. Railroad, 136 Mo. 162; Holwerson v. Railroad, 157 Mo. 216; Tanner v. Railroad, 161 Mo. 497; Hook v. Railroad, 162 Mo. 569; Van Bach v. Railroad, 171 Mo. 338; Guyer v. Railroad, 174 Mo. 344. (4) The trial court admitted incompetent testimony over defendant's objection. Sec. 1102, R. S. 1899; Chitty v. Railroad, 148 Mo. 75. (5) The instructions given by the trial court at plaintiff's request were so erroneous and prejudicial as to necessitate a reversal of this judgment. Henze v. Railroad, 71 Mo. 636; Hook v. Railroad, 162 Mo. 569.

*Willard P. Cave* and *Aubrey R. Hammett* for respondent.

(1) There was no substitution of a new cause of action in this case. Plaintiff had but one son and his name was Charles L. Walker, and he lost his life as stated in plaintiff's petition; and the clerical error in the given name in the original petition was properly corrected in the amended petition. Sec. 657, R. S. 1899; Lilly v. Tobbein, 103 Mo. 477; Parry v. Woodson, 33 Mo. 347; Harkness, Adm., v. Julian, 53 Mo. 238. (2) The measure of care to be expected of a boy four-

teen years old is that of an ordinarily prudent boy of that age and not that of an ordinarily prudent man of mature years. Campbell v. Railroad, 175 Mo. 163; Beach on Contributory Negligence (3 Ed.), sec. 216; Plumley v. Birge, 124 Mass. 57; 7 Am. and Eng. Ency. Law (2 Ed.), 405; Holmes v. Railroad, 88 S. W. 623; Eswin v. Railroad, 96 Mo. 290; Duffy v. Railroad, 19 Mo. App. 380. (3) Appellant has failed to bring up all the evidence in this case; hence, his demurrer to the evidence should not be considered. Williams v. Stroub, 168 Mo. 346; Nash v. Press Brick Co., 109 Mo. App. 601; Goodson v. Railroad, 23 Mo. App. 76; Meriwether v. Howe, 48 Mo. App. 152; Davis v. Vories, 141 Mo. 234; Reid v. Peck, 163 Mo. 333. (4) The trial court very properly overruled defendant's demurrer to the evidence for the reason that plaintiff's evidence did not show that deceased was guilty of contributory negligence, and hence that question was properly submitted to the jury. Stone v. Hunt, 94 Mo. 475; Buesching v. St. Louis Gas Light Co., 73 Mo. 219; Warren v. St. Louis Merchants Exchange, 52 Mo. App. 157; Weller v. Railroad, 164 Mo. 199; Evans v. Railroad, 178 Mo. 508; Heinzle v. Railroad, 182 Mo. 528; Allen v. Railroad, 183 Mo. 411; Erickson v. Railroad, 171 Mo. 647; Van Bach v. Railroad, 170 Mo. 338. (5) The testimony in rebuttal as to the location of the whistling post was clearly competent, as the engineer testified that he sounded the whistle at the post; with the whistling post 2,050 feet away from the crossing, instead of 1,320, the customary distance, the engineer's own statement showed that he had not complied with the requirements of the law. (6) The instructions given by the trial court on plaintiff's part declare the law correctly. Weller v. Railroad, 164 Mo. 180.

LAMM, J.—Walker, as surviving parent of a minor son, Charles L. Walker, the issue of a first marriage, seeks to recover of respondent on an amended petition

$5,000, damages for negligently killing his said child at a public road crossing on May 1, 1901, in Randolph county.

A *resume* of the abandoned petition as well as the trial pleadings will aid in getting at some of the questions presented here.

Sometime in 1902, plaintiff sued for the death of a son named *Elbert Walker*. Steps were taken by defendant to remove this cause to the United States circuit court. When lodged there, it was by that court (for reasons not shown to this court) remanded to the State court. After being so remanded and on May 5, 1903, two years and four days after the cause of action accrued, plaintiff filed an amended petition in which he sued for the death of a son named *Charles L. Walker*. The first petition contained a general averment of negligence, with the additional allegation that the death of Elbert Walker was caused by the negligent omission of the statutory crossing signals. The second petition omitted the general charge of negligence, but counted on the negligent omission of the crossing signals and made the additional charge that defendant's servants, running the locomotive and train, saw the peril of said Charles L. Walker at the crossing, or could have seen his peril by using ordinary care and could have prevented the death of the boy by using ordinary care after such discovery.

Defendant assailed this petition by a motion to strike out, framed on the theory that there was a departure from the original cause of action and not an amendment, and on the theory that the alleged new cause of action was barred by the one-year Statute of Limitations, Revised Statutes 1899, section 2868. What disposition was made of this motion the record does not show, but we assume it was overruled, though neither that fact is shown, nor is exception noted.

Be that one way or the other, on the next day defendant answered by a general denial, and by pleading the

original petition counting on the death of "Elbert Walker," followed by the averment that plaintiff never had a son named Elbert Walker and another showing that the amended petition was filed on the 5th of May, 1903, and that the cause of action therein stated was barred by the express terms of section 2868, Revised Statutes 1899, and is a departure from the original petition. The answer further set up the contributory negligence of Charles L. Walker, in that he drove upon defendant's track at the public crossing without looking or listening, when by looking he could have seen and by listening he could have heard the approach of defendant's train in time to have remained away from the track in a place of safety. Averring, furthermore, that plaintiff by negligently permitting his son to drive upon the track in that way had caused his death. Pleading, also, that it is a citizen of Ohio, while plaintiff is a citizen of Missouri and that the action of the Federal court in refusing to hold jurisdiction of the cause had denied the defendant the privilege, right and immunity claimed by it under the Constitution and laws of the United States, and violated the 14th amendment 'to the Constitution of the United States, and violated section 30 of article 2 of the Constitution of the State of Missouri.

By reply, plaintiff denied all the allegations of new matter contained in the answer, and, by way of further reply, averred that "by an error of the scrivener" the name of Elbert Walker, as the name of the minor son killed, was inserted in the original petition, while in truth and in fact the true name was Charles L. Walker, and that Elbert Walker and Charles L. Walker are, and were intended to be, one and the same person and that person's name was Charles L. Walker.

Thereupon defendant assailed the new matter pleaded in the reply by a motion to strike out, (1) because it was a departure from the cause of action in the original petition, (2) because the new matter constitut-

ed an amendment to the original petition not permitted in a reply, and (3) because the new matter is barred by section 2868, *supra*. This motion was overruled and defendant duly saved its exceptions.

On the heels of the above ruling, a trial was had to a jury and thereat the following facts were uncovered:

Walker's present wife was a widow Peak who, with herself, brought as a further contribution to Walker's family a minor son named Elbert Peak. It is asserted in appellant's brief that this lad was known as *Elbert Walker*, but we find no evidence to sustain such contention and it may be dismissed as a mere plausible conjecture. The Walker family lived in the neighborhood of a coal mine adjacent to the main track of defendant's railroad in Randolph county, at a point between Huntsville and Moberly, which track, barring a slight curve, at the place in hand runs in the general direction of east and west. The two boys, Charles and Elbert, with their father plied the avocation of hauling timber to said mine. The team used, being old and thin, was correspondingly gentle, slow and safe. The wagon used was without a bed, was equipped with a frame for timbering purposes and with a platform for carrying tools, and, when unloaded, those riding thereon rode on its forward bolster. The public wagon road runs east and west south of, parallel with and adjacent to the railroad and, at some distance west of said mine, turns north and thence, between wing-fences leading to cattle guards, with a slight slope up for fifty feet after the turn, approaches and crosses the track. This crossing is the *locus in quo*. The railroad approaches it from the east on a slight curve. At some distance east there is a cut and from where the railroad leaves the cut it runs on a slight fill up to and over the crossing. Taking into consideration the curve, cut, fill, the lay of the land, the wing-fences, etc., described in the record, it seems to be substantially established that, for several hundred feet up the track, one situated as these boys would be,

when at the corner made by said wagon road's turning on the right of way, could see a locomotive and train of cars approaching from the east. Such locomotive and train would be visible for a greater distance, gradually increasing, after the occupants of such wagon would leave said corner and approach the track proper, say, to a thousand feet or more. The curve being to the south, the situation was such that an engineer on a west-bound train, sitting on the north or right hand side of the locomotive cab, would have his vision intercepted by the boiler, smokestack and other locomotive appurtenances, so that he could see anyone on the dirt road, who was immediately approaching this crossing from the south, for only a short distance of track, say three or four hundred feet, before the locomotive reached the crossing.

In this condition of things, and on the first day of May, 1901, appellant's west-bound passenger train, on usual schedule time (as we understand the record) approached this crossing in broad daylight, running about a mile a minute. At that same time Charles L. Walker and Elbert Peak were wending their way to this crossing. They had driven said team and empty wagon from said mine west along said public road to said corner and there stopped, as will presently appear. The boys were riding on the front bolster with their feet dangling close to the double-tree—Charles L. Walker driving. They with their father had delivered a load of timber props at the mine and their father had lingered behind to get a receipt for the delivery. He had warned the boys to this effect: "It's pretty near train time, boys. Notice for the train and be careful and stop at the crossing." Elbert was 12 years old. Charles was fourteen years of age, and, in the words of the record, "was in the habit of driving the team, was a quick, active, bright boy and could see and hear well." Both of the boys were allowed to drive and were used to driving the team over the crossing for a time estimated at two or three years in the business of timber hauling.

The evidence is uncontradicted, also, that in addition to the warning of the father, they knew of their own accord and were conscious of the fact at the time that the train was about due.

After stopping at the corner, they went their way and at the crossing a collision occurred. The locomotive struck the hind wheel of, and demolished, the wagon. Elbert, tossed to one side, jumped up and ran after the team, but Charles, thrown into the air, was caught on the cowcatcher as he fell and was found mangled and dead thereon when the train arrived at Huntsville, some two miles away. The fireman had been feeding his fire. When he resumed his seat the train was nearing the crossing and he saw, what the engineer could not see at that time, to-wit, the boys turning the corner, looking the other way and evidently intending to cross the track. He warned the engineer, who at once, he says, put on the full force of the air to stop and thereupon also gave alarm signals. The engine was not reversed. The evidence shows that, at that going rate, the hard and full application of the air was the best means at hand, considering the safety of the passengers, to stop the train. At least, there was no evidence contradicting the testimony of the engineer to the effect that he employed the best and safest means. To stop a train going as this one on that track, under the evidence presented to us in this cause, would take from one thousand to seventeen hundred feet and the evidence all points to the fact that the engine was much closer to the crossing than that when it was discovered that the boys were bent on crossing the track. There was evidence pro and con as to whether the speed of the train slackened, but, in view of the way the case was put to the jury by plaintiff, as will presently be seen, it becomes immaterial and need not be further referred to. When the collision occurred the dust of the train somewhat obscured the vision. The fireman and engineer were satisfied they saw both boys escape and,

hence, proceeded on their way to Huntsville where, as said, Charles L. Walker's body was found prone upon the cowcatcher.

There was substantial evidence that neither the bell was rung nor the whistle blown as required by statute, and, *per contra*, there was strong countervailing proof on that issue of fact. All witnesses agree that alarm signals were given, but they were of no avail considering speed and distance.

It seems at this crossing there is a hamlet or collection of occupied dwellings and that a number of persons saw the accident who, together with Elbert Peak, testified for plaintiff. Several witnesses say, with indefiniteness as to the exact location, that the boys at a certain time stopped, stood up and looked in both directions. To sum up on this point, we take it, the testimony shows this stop was made at the corner where the public road turns on to the right of way, that is to say, fifty feet from the railroad. Apposite to the fact just pronounced, the boy, Elbert Peak, testified in chief as follows: "As we came down there we turned south (north?) and stopped at the corner and got up and listened for the train, but we did not see or hear it, though we looked both ways; not seeing the train or hearing it we started to cross and just as we got the horses on the track we saw the train coming . . . We stopped at the corner of the crossing before we went up there; at the corner of the fence as we got on the right of way." Again, on cross-examination, he said: "We drove up towards the railroad and we were going at a walk, walking slow; were down at corner when we stopped, looked and listened."

We think, furthermore, the evidence shows that neither of the boys looked to the east after that stop until they were, to all intents and purposes, on the track and in imminent danger. This sufficiently appears from the following: Elbert Peak, referring to persons they saw at the time of the stop and afterwards, testifies

this way: "Did not see anybody else there; saw boys on right of way towards Huntsville" (*i. e.,* west); "didn't know who they were; didn't notice to see what they were doing, whether they were standing still or walking; was looking over that way where they were part of the time, after I stopped, looked and listened before going on the track; train was right on us when I first saw it, no farther than across this room; . . . We stopped at turn and looked for the train and listened and could not see or hear anything of it and we drove up; the team was a slow one and we could hardly get them to go, and he whipped them up, but by that time the train was right on us, but we did not stop to look or listen, neither of us; we stopped after we passed Mr. Riley, and drove up there without looking any more."

It appears further from plaintiff's witnesses that two boys, Kaufmann and Fioli, had been fishing and were west of the crossing, say 100 yards or so, coming east on the railroad track or right of way. As there is no evidence showing any other persons except these two boys west of the crossing, we infer they are the boys referred to by Elbert Peak as being on the right of way towards Huntsville. Kaufmann says (testifying for plaintiff): "When I first saw the boys" (*i. e.* Elbert Peak and Charles L. Walker) "they were on the crossing, pretty near at it; the horses were going pretty slow; when I first saw them they were looking towards us; I had some fish with me in a bucket; when the engine got close to them one of the boys looked around and saw it and jumped back and started to run for the hind end of the wagon, and the train hit them; he did not look around until the engine was at him; from the time I first saw them until the boy jumped up they were looking down in the direction of me."

Fioli was also produced by plaintiff and corroborated Kaufmann and further testified as follows: "When we first noticed the boys they were in the wagon going towards the railroad; the horses' heads were

about on the south rail—to the south rail, at the time I first saw them; the boys were looking at us; when they got up to the railroad they looked the other way and saw the train coming; at that time they were just going upon the track; . . the horses were on the track before the boys looked around and saw the engine; they were across the track; the wagon was in the middle of the track when they looked around; when we first saw them they were on the railroad; they were looking towards us first, and when they got on the railroad, when about the middle of the wagon got there, they looked and saw the engine coming; . . . the horses were over the track when they looked; the horses' heads were about to the track when I first noticed them; at that time the boys were looking at us.''

Plaintiff offered himself as a witness and testified to the following things, *inter alia*: ''The name of the boy killed was Charles L. Walker and not Elbert Walker.'' On the question as to how the name Elbert Walker got into the original petition, the only explanatory testimony adduced came from him and is as follows: ''I could not tell you just how that name got in there, but it is wrong; just one boy was killed; I never had a boy named Elbert Walker.''

The engineer having testified for defendant that he gave the usual statutory crossing signals at the whistling-post east of the crossing, the plaintiff was allowed in rebuttal to show that the whistling-post in question was not eighty rods from the crossing, but, to the contrary, was nearly half a mile therefrom. To the offer of this testimony the defendant lodged the following objections: (1) As not being in rebuttal; (2) because there is nothing in the pleadings to indicate that it is a ground on which to base their charge of negligence in the petition that the defendant's train failed to whistle at the proper distance from the crossing; (3) that no charge is made in the petition filed in this case

193 Sup.—30

about the whistling-post not being at the proper distance from the crossing; and (4) because the statutes of the State of Missouri do not require the whistling-post to be located at any special point and for that reason this testimony is incompetent, immaterial and irrelevant. These objections were overruled and exceptions saved.

Objections were made by defendant to other testimony, but they are without noticeable merit, in our opinion, hence such testimony and objections will be passed by.

In surrebuttal defendant offered to show what the rule of defendant company was in regard to whistling for a road crossing. This evidence was objected to by plaintiff "as not being matter in rebuttal and also as calling for a matter fixed by the statutes," and was by the court excluded on the theory that the case would not be reopened without the consent of the other party, who would not consent.

At the close of plaintiff's case, defendant interposed a demurrer to the evidence, which demurrer was disallowed and exceptions saved.

At the close of the whole case, the defendant asked a peremptory instruction to the effect that the plaintiff was not entitled to recover under the pleadings and the evidence. This instruction was refused and exceptions saved.

Six instructions were given for plaintiff. Four of them were instructions severally defining "preponderance of evidence," directing the amount of the verdict, if a finding was made for plaintiff, and directing the forms to be employed. They seem in good form and need not be noticed. Instructions 1 and 2 are set forth, partly to show the theory of plaintiff below, and are as follows:

"1. If the jury believe from the evidence in this

cause that on the first day of May, 1901, the defendant's train approached the point mentioned in evidence, and that at such point a traveled public road crossed the defendant's railroad; and that the bell of the locomotive engine which hauled said train was not rung at a distance of at least eighty rods from said crossing and kept ringing until said engine crossed said public road; and that the steam whistle attached to said engine was not sounded at least eighty rods from said crossing and was not sounded at intervals until it had crossed said public road; and that plaintiff's minor unmarried son, Charles L. Walker, was approaching said crossing on said traveled public road, driving a road wagon, and that by reason of said failure of defendant's servants upon said train to sound said whistle or ring said bell as aforesaid, the said engine struck said wagon while said engine was crossing said public road, and killed plaintiff's said unmarried minor son, Charles L. Walker, and at the time of said injury the plaintiff's said son, Charles L. Walker, was exercising ordinary care in crossing said railroad, the jury will find  for the plaintiff and assess the damages as [sic] five thousand dollars.

"The term 'ordinary care' as used in this instruction means such care as a person of ordinary prudence would exercise under like circumstances.

"2. Negligence on the part of the deceased which will prevent the plaintiff recovering in this action must be such as directly contributed to his injury, and consists of the want of ordinary care. Ordinary care means that degree of care which may be reasonably expected of ordinary prudent persons in the situation of plaintiff's said deceased son, at and just before the time the accident occurred, and in determining whether the deceased was using such care, you should take into consideration all the circumstances surrounding him at the time. And the burden of proving contributory negligence on the part of Charles L. Walker rests on the de-

fendant, and unless the defendant has proved such contributory negligence by a preponderance of the evidence, you cannot find for the defendant on that ground. ''

These instructions were objected to and, exceptions being saved, they are now challenged as erroneous.

For defendant three instructions were given, which, as they further show the theory the case was tried upon, will not be amiss here, thus:

''1. The court instructs the jury that it is the duty of every person approaching a railroad crossing to look and listen for approaching trains, and that this is especially the case where such person has knowledge or is warned that a train is due; and that this duty to look and listen is a continuous duty that ends only when such railroad track has been reached and passed; and in this case even if the deceased, Charles L. Walker, stopped his team at or near the corner of the fence of the crossing, and looked and listened for the approaching train of which he had knowledge and had been warned of, yet if after so stopping and so looking and so listening, said deceased, Charles L. Walker, drove his team slowly on some forty or fifty feet to the crossing, and onto the railroad track in front of the rapidly approaching train which was then dangerously near, and in full view, without at any time after so stopping near said corner, again looking for said train, and was thereby struck and killed, then said Charles L. Walker was guilty of such negligence directly and proximately contributing to his injury and death as will bar a recovery in this case; and if the jury so find the facts to be, their verdict must be for the defendant, even though the jury may find that the defendant's servants operating said train were guilty of negligence with respect to sounding the whistle and ringing the bell on the engine.

''2. The court instructs the jury that even though they may find that the train which killed Charles L.

Walker was then and there running at fifty, or even sixty miles an hour, yet, such rate of speed is not in itself a negligent act at the time when, and place where said train was said to be running.

"3. The court instructs the jury that the burden of proof is on the plaintiff to prove by the weight of the evidence the negligent acts charged in his petition, and unless the jury believe and find that the plaintiff has so proved said alleged negligent acts, by the weight of the evidence, fairly considered, then the verdict of the jury must be for the defendant.

"If the jury find for defendant, the form of the verdict will be: . . ."

Objections were made to statements of plaintiff's counsel in his address to the jury and exceptions saved, but the matter involved is not of sufficient consequence in our opinion to merit serious attention and will be treated as by-matter.

The jury returned a verdict in favor of plaintiff for $5,000, and defendant company duly appealed.

(1)    On this record, it must be held the proof was of such character that the allegation in the amended petition predicating a recovery upon alleged negligence in failing to stop the train after the perilous condition of Charles L. Walker was discovered, or should have been discovered, was not supported by evidence. Respondent recognized and acquiesced in this situation by asking no instruction submitting that theory to the triers of fact.

(2)    On the other hand, we do not understand that appellant seriously contends a constitutional question is pending before us predicated of the failure of the United States circuit court to retain the jurisdiction once graciously handed over by the State court. Complaints of errors committed by that court, if any, should be poured into the ears of the Federal court having rightful jurisdiction (and disposition) to correct them. Any other practice would breed confusion and discord.

A court having superintending appellate corrective jurisdiction may well be likened to a principal and by that token the doctrine of *respondeat superior* has sensible application.

Then, again, we do not know whether or no appellant is a citizen of Ohio. All we see by this record is that it said so and it prayed to be sent to the Federal court. Its prayer was answered, but that court turned a deaf ear and refused to entertain jurisdiction. For aught we know the United States circuit court found as a matter of fact that appellant was not a citizen of Ohio, or that some fatal infirmity existed in its papers. *Hinc*—if we may be allowed so to speak—*hinc illae lacrimae,* perhaps.

When the case came back to the State court, what was that court to do? Refuse jurisdiction and again transfer it to the Federal court, only to have it handed back once more? It would be hard lines, indeed, if respondent's cause had no abiding place, whatever, and if no court would open its door for its entertainment. Such game of shuttlecock and battledoor, once well taught and well played, would make ducks and drakes of the law—would make of respondent's cause nothing but a voice crying in the wilderness for some path leading to a court house. The Federal court had jurisdiction to pass upon its own jurisdiction and to discern and determine the boundaries thereof. The wisdom and grounds of its determination we ought not to examine into or sit in judgment upon. The State court could do no less, or no more, than take the case back at the hands of the court it had sent it to. Appellant appeared, filed an answer, submitted to a trial, and now in its brief does not point out to us any constitutional infirmity in the jurisdiction of the State court, nor does it put its finger upon any specific clause of the Federal constitution or the State Constitution which was impinged upon by the reassumption of jurisdiction by the State

court.  The constitutional questions will, therefore, be put aside.

(3)    Appellant's objections to the introduction of evidence by respondent in rebuttal tending to show, and in fact showing, that the whistling-post was nearly 160 rods, instead of 80 rods, east of the crossing, are without merit.  This evidence was typical matter in rebuttal.  Because, appellant introduced testimony showing that the  crossing signals were given, not at least 80 rods from the crossing, but at the whistling-post.  While appellant was putting in its case was the first time such evidence appeared.  By this evidence, it was, of course, *assumed* that the whistling-post in question was the  proper place to give the crossing signal.  Now, the statutes require the signals to be given at least 80 rods from the crossing.  [R. S. 1899, sec. 1102.]  Respondent's rebutting proof tended to destroy the very assumption upon which appellant's testimony was based, to-wit, that that particular whistling-post was the proper place to give signals.  Nor was it necessary for respondent to have pleaded that the whistling-post was not at the proper place.  That matter was no constitutive element in his cause of action.  The arrangement of whistling-posts would seem largely a matter of concern as a convenience to railroad employees in complying with the statute.  If the post is at the wrong place, such fact will not relieve a railroad company from liability, because the whistling must be done at the place designated by the Legislature, not by a post.

The same disposition must be made of the ruling of the court upon appellant's offering evidence in sur-rebuttal to show what the rules of the company were in regard to whistling for a road-crossing.  If the offered evidence had tended to show that the whistling-post was at the proper place, it would have been competent in sur-rebuttal and should have been allowed, because that fact had never been challenged as a fact until re-

spondent challenged it in his rebutting evidence. But the offer was not to show that the whistling-post was 80 rods from the crossing. It was merely to show what the rules of the company were relating to whistling. Cases might arise where the whistling rules of the company might be pertinent. But in this particular instance the rule laid down by statutory law ought to be the controlling rule and not the rules adopted to regulate the corporate family concerns of appellant, unless we are to adopt the novel notion that such rules may be allowed to override, or modify the application of, express statute. In conclusion, we incline to the view that of two antagonistic voices, each calling for obedience—one of the law, and one of a company rule—the voice of the law has an obstinate and driving preference for the serious purposes of jurisprudence.

(4) By failing to produce here the order, if such there was, of the court, *nisi,* overruling the motion to strike out the amended petition and an exception to that ruling, and by answering over, appellant waived all right to complain of any departure in the amended petition, considered merely as a departure and without reference to the Statute of Limitations (Liese v. Meyer, 143 Mo. l. c. 556, and cases cited), and, hence, may not be heard to complain now of such ruling.

So, too, the ruling of the court on appellant's motion to strike out parts of respondent's reply, in so far as such ruling affected the mere question of *departure,* is disposed of by the holding just made, because, when the motion was filed, appellant had waived the departure, as such, by previously filing an answer. Nor do we consider the objection that the new matter pleaded in reply constituted an amendment to the original petition not permitted in a reply, as well taken, because the reply was directed to appellant's answer to the amended petition. In fact, the original petition was *functus officio,* and no matter pleaded in such reply could be held to be pertinent or impertinent by mere reference to

the original or abandoned petition, as contended by appellant, but must be measured by a reference to the amended petition alone. In that amended petition respondent sued for the death of Charles L. Walker. In answer appellant pleaded the Statute of Limitations to any cause of action arising from the death of Charles L. Walker. The reply thereto was, in substance and effect, directed to the avoidance of that plea and was well enough, judged of from the form of the precise objection now under review.

The other and more serious question raised on the present motion refers to the Statute of Limitations of one year, and, as that is fully preserved by the answer to the amended petition, and arises as well on the demurrer to the evidence, as on the peremptory instruction asked by appellant, it may be considered presently in connection with those matters.

(5)  Although appellant by answering over waived all questions of mere departure, yet there is preserved by the answer to the amended petition the same question in the form of a substantive defense—the answer pleading the Statute of Limitations—and if it be true that the cause of action stated in the amended petition is a new cause of action, then the plea in bar is well presented. The section invoked as a defense (sec. 2868), was repealed in 1905 (Laws 1905, p. 137), but, as in force up to that time, reads: "Every action instituted by virtue of the preceding sections of this chapter shall be commenced within one year after the cause of such action shall accrue"—one of the preceding sections of the chapter being the section of the damage act upon which this suit is based. As said, the original petition was for the death of Elbert Walker, while by the amended petition plaintiff sues for the death of Charles L. Walker. It may be well to set forth with some precision the allegations of the original petition referring to Elbert Walker, thus: "Plaintiff states that he is the father of one Elbert Walker now

deceased; that the mother of said Elbert Walker died many years ago; that said Elbert Walker, at the date of his death hereinafter mentioned, was a minor, fourteen years old and had no children and was unmarried. . . . . Plaintiff states that on the first day of May, 1901, while said deceased minor, Elbert Walker, was in the exercise of due care, etc., . . . he, said Elbert Walker, was by the negligence, etc., . . . run upon, into and against, . . . by reason of which he, Elbert Walker, received serious and grievous bodily injuries, from which he instantly died . . ."

The rule of law applicable seems to be that, "where the amendment sets up no new matter or claim, but is a mere variation of the allegations affecting a demand already in issue, then the amendment relates to the commencement of the suit, and the running of the statute is arrested at that point; but where the amendment introduces a new claim, not before asserted, then it is not treated as relating to the commencement of the suit, but as equivalent to a fresh suit upon a new cause of action, the running of the statute continuing down to the time the amendment is filed." [Lilly v. Tobbein, 103 Mo. l. c. 490; Buel v. Transfer Co., 45 Mo. l. c. 563.] VALLIANT, J., speaking to this question, said for this court in Bricken v. Cross, 163 Mo. l. c. 453, that, "The question whether the date at which the defendants' ten years' possession should have been complete to give them title should be that of filing the original, or that of filing the amended petition, depends on the question of whether the amended petition merely restated, in more accurate words, the same cause of action that was stated in the original, or stated a different cause of action, or for the first time stated any cause of action at all."

In applying the foregoing rule, the first inquiry ought to be, what is the proper judicial attitude toward amendments with reference to the Statute of Limitations? The answer, in the language of NAPTON, J., in

Lottman v. Barnett, 62 Mo. l. c. 170, is: "Amendments are allowed expressly to save the cause from the Statute of Limitations, and courts have been liberal in allowing them, when the cause of action is not totally different." The rule thus announced is steadily applied. [Lilly v. Tobbein, 103 Mo. l. c. 490-1; Courtney v. Blackwell, 150 Mo. l. c. 271-2.]

Again: the legislative policy evidenced by statutory provisions for amendments, which provisions are highly remedial, and have been construed, *ex industria,* by the courts to further the very life. and purpose of their enactment, should be kept in mind. Thus: by Revised Statutes 1899, section 657, it is provided that, "The court may, at any time before final judgment, in furtherance of justice, and on such terms as may be proper, amend any . . pleading, . . . . . by correcting a mistake in the name of a party, or a mistake in any other respect, or by inserting other allegations material to the case, or, when the amendment does not change substantially the claim or defense, by conforming the pleading or proceeding to the facts proved." By section 659 it is provided that at every stage of the action the court shall disallow any error or defect in the pleadings not affecting the substantial rights of the adverse party. By section 660 it is provided that, even after final judgment, the court may correct a mistake in the name of a party or a mistake in any other respect or rectify any mistake or imperfection in matters of form, in furtherance of justice. By section 672 it is provided that, "When a verdict shall have been rendered in any cause, the judgment thereon shall not be stayed, nor shall such judgment, or any judgment after trial or submission, . . . be reversed, impaired or in any way effected by reason of the following imperfections, omissions, defects, matters or things, or any of them, namely: . . . *Tenth,* for any mistake in the name of any party *or person* . . . *when the correct name* . . . *shall have been rightly alleged in any*

*of the pleadings or proceedings."* By section 676 it is made the duty of a court to construe provisions of law relating to pleadings and to adapt the practice thereunder so as to secure parties from being mislead, to place the party not in fault as nearly as possible in the same condition he would be in if no mistake had been made, to distinguish between form and substance, and to afford known, fixed and certain requisitions in place of the discretion of the court or judge thereof. Again: By section 865 we are prohibited from reversing a judgment unless we believe that error was committed against appellant materially affecting the merits of the action.

The trouble is not with the legislative policy outlined in the foregoing provisions, nor with the rules of law relating to amendments of pleadings, but the pinch comes in applying that policy and those rules to concrete cases. Broadly speaking, it may be said that under cover of an amendment a new cause of action may not be asserted, whether the Statute of Limitations is involved or not, but such departure, where the Statute of Limitations is not involved, may be waived by answering over. And may be so waived if the Statute of Limitations is involved, unless such statute, as here, is invoked by the answer. On the other hand, in blandly applying the statutes relating to amendments of pleadings, the courts have said that a name even of a party to a suit, is but a means of identity. Thus, process served upon the right person by the wrong name may be, by amendment, made good. [Parry v. Woodson, 33 Mo. l. c. 348.] So, too, in Harkness v. Julian, 53 Mo. 238, it was held that a suing administrator may amend by correcting an averment as to his title to the note in suit. In that case, by the first petition plaintiff sued as an administrator of Elam. By an amended petition he sued as administrator of Dysart, assignee of Elam, and the amendment was allowed. So, in Wellman's Admr. v. Dismukes, 42 Mo. 101. That suit was to en-

force a vendor's lien. The defense was a failure of title and consideration, and defendant also asked to recover payments made. At the trial it was shown that one Glasscock had become vendee of Dismukes and was entitled to stand in his shoes and recover back any money paid on the original purchase of the land. On this showing of facts, the pleadings were allowed to be amended to bring in Glasscock, who appeared, answered and had judgment in his favor. In Lilly v. Tobbein, supra, an amendment was allowed to a petition in a suit commenced in the name of an unincorporated society, a church, to establish a rejected will. After the five years allowed for commencing such suits, an amendment was held well made which substituted the names of members of the church, suing in their own behalf and in behalf of other church members, as parties plaintiff.

The test of an allowable amendment has been formulated in the pronouncement that the same evidence and the same measure of damages are the *criteria* of judging of the allowableness of an amendment. [Scovill v. Glasner, 79 Mo. 449; Liese v. Meyer, supra.] But the distinction has been well made that if the test is to be simply that the *quantum* and quality of the evidence should be precisely the same, then the very purpose of allowing any amendments whatever would be defeated. [Burnham & Co. v. Tillery & Co., 85 Mo. App. l. c. 458-9; Rippee v. Railroad, 154 Mo. l. c. 364-5.] It has been further said that the quality of the evidence is not so much the question as is the quantity or character of the evidence. [Burnham v. Tillery, supra; Clothing Co. v. Railroad, 71 Mo. App. l. c. 246, et seq.] In the latter case many cases were reviewed and cases elsewhere cited with approval holding that the statutory requirement that an amendment "shall not change substantially the claim or defense" refers to the *general identity* of the transaction forming the cause of complaint; to cases holding that where the gist of the action

remains the same although the alleged incidents are different, an amendment is well enough; to cases holding that where the amended petition is merely an alteration of the modes in which defendant has broken the contract or caused the injury, it is not the introduction of a new cause of action; and to cases holding that one test applied is: "Would the recovery on the original complaint be a bar to a recovery on the amended complaint?" And see an illuminating discussion of the matter now up, by GOODE, J., in Stewart v. Van Horne, 91 Mo. App. 647.

It may be conceded there are discords in the decisions, but we are of the opinion that, in the light of the foregoing case law, and keeping in mind the liberality allowed in making amendments to get at the right of the matter, to avoid costs and bring lawsuits to an end, to avoid the hardships of the Statute of Limitations, on the one hand, and at the same time, on the other hand, to protect defendants from the injustice of grafting upon one cause of action an entirely different one (*i. e.*, putting new wine in old bottles), or grafting upon no cause of action whatever a good cause of action, the amendment in this case was well enough; because it will be seen that there was but *one* boy killed in the collision and defendant was notified of that fact. There could be no departure, then, on that behalf in the amendment. It will be seen, further, that the identity of the boy killed was established by his age, fourteen years, by the date of the accident, May 1, 1901; by the fact that plaintiff was the only surviving parent of the boy that was killed—all these means of identity were precisely the same in both petitions and are entitled to significance in determining the question. So, too, the measure of damages can not be held to be otherwise than the same, and moreover the *quantum* and quality of evidence called for are precisely one and the same under both petitions. It would be a harsh ruling to hold that although the law permits contracts, statutes and

documents to be judged of by their true intent, discarding mere self-evident tongue and pen lapses, yet, that a different rule would be applied to pleadings. In this case, there was no boy named Elbert Walker. The father, in the first petition, was self-evidently suing for the actual boy killed and not for a myth. He had but the one boy whose mother was dead, and we think defendant could not have been misled, or otherwise injured in its substantial rights, by the amendment, unless we are willing to hold that a mere mistake, once made, in the Christian name of the person killed ought to be irretrievable after one year, and, hence, determinative of the very right of a case—all of which we are unwilling to do.

(6) The remaining questions relate to the instructions, and the only material question involved, in our opinion, is whether appellant's peremptory instruction or demurrer to the evidence should have been given.

It was once contended that the very heart of the legislative intent in the statute requiring a bell to be sounded for eighty rods on approaching a crossing, or a whistle to be blown at least eighty rods therefrom and sounded at intervals as the crossing is approached, was to avoid the distressful destruction of life and limb at crossings arising from the momentary lapse of vigilance or other inadvertences of those about to cross a railroad track on a public highway, which inadvertences and lapses, mere minor negligences all, are incident to every phase of human life; that is to say, if one be distraught, preoccupied, dull or forgetful as he approaches such crossing, the whistle or sounding bell, presaging doom in its note or stroke, may, "as coming events cast their shadow before," recall him to himself and, perchance, prevent impending results. Indeed, as a matter of *a priori* reasoning, it might well be said that, as a traveler on the public road and a railway company have mutual and co-existing rights at a

public crossing and, as neither may know when the other may purpose to assert that right, the one who intends to occupy such crossing at great speed with such tremendous and death-dealing machine as a locomotive engine, should always be held to announce its intention. But all such philosophic speculations are *in nubibus*, because the courts, in adopting a working theory for our statute, early proceeded on the theory that the man running the locomotive and the man driving the team are both but men after all. Both may have their moments of inattention and inadvertence and, therefore, both have the corresponding duty of care and caution. So that, while the one (by statutory command) must look for the crossing and give the statutory signals to save life, yet, the other (by judicial construction) must also take a hand in saving his own life and must stop, if need be, so he can hear and look and listen to avoid peril. The logical sequence is that if negligence on the one side and negligence on the other concur there can be no recovery, and such is the uniform rule except in those states where the doctrine of comparative degrees of negligence holds. The statute, thus construed, has been long left intact by our lawmakers and accordingly must be held satisfactory, or it would have been modified.

There being no statute regulating the rate of speed at country crossings, no particular rate of speed can be held negligent and so the court instructed the jury in this case.

The answer pleaded the contributory negligence of Charles L. Walker as a concurring act of negligence avoiding liability. The evidence is undisputed. The boy was of bright intelligence, fourteen years of age and had good eyesight and hearing. Not only so, but there were no confusing circumstances accompanying the accident, no other trains approaching, no other tracks to watch, no other engines puffing as if to start. The view to the east was plain from the corner where the wagon

stopped and they looked and listened, for several hundred feet. The train approached the crossing on a slight fill. It may be, as it was going so much as eighty-eight feet per second, that at the time the boys stopped at the corner it was not in sight, for they were obliged to travel fifty feet to get to the track and were going at, say, three miles per hour—a mere walk—and a computation will show that while they were covering that 50 feet the train would run nearly 1000 feet. If we add to that the time lost in starting after their stop and look, we are impressed with the fact the train was not in sight. But it must have come in sight shortly thereafter, and, what is more to the point, while decedent was in complete safety. The evidence and circumstances unitedly are such as to show, beyond cavil or doubt, that neither of these boys ever looked to the east again. Nay, the positive evidence is they looked to the west and were quite occupied in watching some other boys who were on the right of way to the west returning from fishing. It was full day and in the middle of the afternoon. They went slowly up the slope to the track and, when on it, turned their eyes to the east and became aware for the first time the train was upon them. In this condition of things, an adult, male or female, would not be allowed to recover as a matter of law. [Guyer v. Railroad, 174 Mo. 344; Green v. Railroad, 192 Mo. 131; Schmidt v. Railroad, 191 Mo. 215.] And under similar circumstances it has been held, by a divided court, that a bright, intelligent boy, eleven years old, was guilty of contributory negligence as a matter of law. [Payne v. Railroad, 136 Mo. 562.] The case at bar is much more pronounced; for these boys knew the train was about due. It was its usual time, and they had been warned and partly acted upon the warning. Besides, they were familar with the crossing and the danger incident thereto. They had hauled timber over it for several years, and, whatever the pre-

conceived views of the writer be, it seems the case presents a condition of things in which there can be no recovery unless the proposition in hand be threshed over anew and the doctrine of this court winnowed and reformulated. It has been held by us that at a certain age, to-wit, eight years, contributory negligence will not be imputed as a matter of law. [Holmes v. Railroad, 190 Mo. 98.] In Graney v. Railroad, 140 Mo. 89, it was held that on the mere fact of age alone (11 years and 9 months) a boy, small of his age, where the case gave no information in respect to his intelligence, knowledge of the running of trains or physical activity, the court would not as a matter of law declare he was guilty of contributory negligence in standing so near the track as to be in danger of rotary-air suction while a train is passing. In that case the boy was standing from two to three feet from the west rail of the track upon which the train was passing. When about one-half or two-thirds of the train had passed, he was seen to turn around, fall upon the ground and roll over under the train, and evidence was introduced showing that his fall and rolling over were produced by the suction or whirling motion of the air caused by the motion of the train. This case was here again and is reported in 157 Mo. 666. There it was held, *inter alia,* that Graney's brightness and intelligence (presumably shown at the second trial) placed him on the same plane as if *sui juris.* [P. 679.]

It keenly touches the heart to see a boy's life crushed out as this one's was, and care must be taken to see that a delicate judicial equipoise is not lost in considering such case. It has been said in some cases that the true rule is, in effect, that where there can be two opinions among reasonable men based on the evidence upon the question of contributory negligence of a youth, the question should be sent to the jury. But where there could be but one opinion about it among reasonable men, it is a matter of law for the court.

[Campbell v. Railroad, 175 Mo. 161.]   The rule of law that a youth should not be held to the same degree of care as an adult is one inherent in the nature of things and springs spontaneously in the human mind, because, neither the law, nor the parent, nor society judges a youth as an adult, and this is in accord with *jus naturale.*   Thus, it was held by one entitled to speak *ex cathedra,* as follows: "When I was a child, I spake as a child, I understood as a child, I thought as a child; but when I became a man, I put away childish things." Nevertheless, the known danger from a locomotive is as apparent to a bright, experienced boy of fourteen as to an adult, and the necessity and office of using his eye is such a primal and simple matter as to be well within the grasp of that age.   Can it be said that if this boy had blindfolded himself and in that condition had driven across the track, after the warning he had received and when it was shown that he had knowledge the train was due and might be any instant upon him, the appellant would be liable?   We think not.   If, instead of blindfolding himself, he did what was the same, that is, turned his face and looked in the other direction, is the principle not the same?

But in this case it is not necessary to allow the case to pass off on the question that, as a matter of law, we should hold that this boy was *sui juris* and guilty of contributory negligence.   Because, as will be seen by the instructions given for the plaintiff, he asked to have the case submitted on the theory that the boy was *sui juris,* and the degree of care invoked by him in instructions 1 and 2, is the degree of care expected and exacted of ordinary prudent persons.   Following that, the defendant was allowed an instruction putting the case to the jury on the theory that the boy was *sui juris,* and that his duty to look and listen for the approaching train was not entirely performed by stopping fifty feet away, and slowly and without again looking approaching the track.   The case having been tried below on that

theory must be reviewed here on the same theory. [Chinn v. Naylor, 182 Mo. l. c. 594-5.] On this view, there is no escape from the conclusion that the court, on the undisputed facts, instead of submitting the case to the jury, should have taken the case from the jury.

Other objections leveled at respondent's instructions need not be considered.

The cause is, accordingly, reversed.

All concur, *Marshall, J.,* in the result.