## MOCKOWIK, Appellant, v. KANSAS CITY, ST. JOSEPH & COUNCIL BLUFFS RAILROAD COMPANY.

### Division One, May 30, 1906.

1. **NEGLIGENCE: Demurrer: Evidence Considered.** In determining whether or not plaintiff, because of his own negligence, had a case upon which to go to the jury, defendant's testimony, where controverted, cannot be considered. In such case, plaintiff is entitled to the full force of all uncontroverted facts and to all his controverted evidence, and is to be allowed every reasonable and favorable inference of fact deducible from all the evidence.

2. ——: ——: **When Question of Law.** · If there can be two views of plaintiff's conduct entertained by fair-minded men, the one condemning and the other exonerating him, he is entitled to the verdict of a jury on the question of his contributory negligence; if, however, reasonable men can entertain but one view of his conduct, and that adverse to him, the question resolves itself into one of law.

3. ——: ——: ——: **Error in Instructions.** A verdict for defendant will not be reversed for error in giving instructions, if plaintiff was clearly guilty of such contributory negligence as precludes his recovery, for in such case the court should not permit the jury to pass on the case at all.

4. ——: **Contributory: Stepping on Track: Bell and Headlight.** Where plaintiff, a mature man, possessed of good sight and hearing and familiar with the track and the movement of trains, made only a hasty glance at an engine on the track and paid no further attention to it, not even to see whether it was moving or standing still, but stepped on the track and was struck by it, his negligence was the proximate cause of the injury, and notwithstanding the bell was not rung or the whistle blown or the headlight displayed and the train run at excessive speed, he cannot recover.

5. ——: ——: ——: **Concurrent Negligence.** Where a mature man, in possession of all his faculties and occupying a place of safety, negligently moves to a place of danger immediately in front of a railroad engine, so that those controlling it, though they themselves may be negligent in not ringing the bell or sounding the whistle or in running at excessive speed, seeing his danger may not save him by the exercise of ordinary

care, he has no cause of action against the railroad; for his negligence and the railroad's negligence are concurrent and in that case the law does not give plaintiff the right to recover.

6. ———: **Speed: Ordinance: Reliance upon Obedience.** A pedestrian who presumes that those in charge of a railroad train were obeying a city ordinance regulating speed, should so testify, if he is alive and goes on the stand to tell the circumstances of his injury. Presumptions are not indulged in the presence of actual facts, or where the facts may be known by the exercise of ordinary care.

Appeal from Buchanan Circuit Court.—*Hon. A. M. Woodson*, Judge.

AFFIRMED.

*Grant Watkins, C. F. Strop* and *Eugene Silverman* for appellant.

(1) The second instruction given for defendant which told the jury that defendant had a right to operate its trains at ten miles per hour was erroneous. (a) Because the ten-mile ordinance on its face does not purport to cover that portion of the track where plaintiff received his injuries. Therefore, the general ordinances prescribing five miles per hour, and also the special ordinance granting the right of way at the place of the accident and limiting the rate of speed to five miles per hour, were in force and should have controlled the rate of speed of defendant's trains at the point of accident. (b) Because even though the ten-mile ordinance was intended to regulate the speed of defendant's engines at the point of the injury, yet said ordinance was void and was repealed by the general ordinances of the city thereafter passed regulating the speed of engines and limiting the same to five miles per hour, and even if not repealed was void because in conflict with the general ordinances of the city. Sluder v. Railroad, 189 Mo. 107; City v. Tate, 130 Ill. 247. (2) The correct rule is that plaintiff has a right to rely

upon the fact that the ordinances will be complied with and to regulate and govern his conduct accordingly, and the failure to comply with the ordinances is negligence. Riska v. Railroad, 180 Mo. 195; Weller v. Railroad, 164 Mo. 180; Sluder v. Railroad, 189 Mo. 107.

*O. M. Spencer, R. E. Culver* and *H. J. Nelson* for respondent.

(1) The court did not err in instructing that the engine had a right to run at a speed of ten miles per hour. (a) Because the special ten-mile ordinance related to running of engines on defendant's track at point of accident. (b) Because there is no evidence that the general speed ordinance was passed after the special ten-mile ordinance, and it was not so passed, but even if it had been it would not operate as a repeal of defendant's special speed ordinance. Reischenberg v. Railroad, 161 Mo. 85; Campbell v. Railroad, 175 Mo. 177. (c) Anyhow, plaintiff was guilty of wantonness in stepping immediately in front of the moving engine, and speed was immaterial. Moore v. Railroad, 176 Mo. 544. (2) Plaintiff's own negligence barred a recovery upon any theory. (a) Because he saw the engine and went onto the track. Skipton v. Railroad, 82 Mo. App. 134; Fanning v. Railroad, 103 Mo. App. 151. (b) Because he stepped on the track immediately in front of the engine. Moore v. Railroad, 176 Mo. 544; Boyd v. Railroad, 105 Mo. 381. (c) Because he was guilty of wantonness and cannot recover even on "last-chance" doctrine. Moore v. Railroad, 176 Mo. l. c. 544; Ross v. Railroad, 88 S. W. 146. (d) The verdict was therefore for the right party, and must be affirmed, even if there were errors in the instructions. Moore v. Railroad, 176 Mo. 545.

LAMM, J.—From a verdict against him in an action for personal injuries alleged to have been caused

by the negligence of defendant in operating a switch engine, plaintiff appeals.

The cause was heard on an amended petition, charging defendant with operating an engine on Fifth street in the city of St. Joseph at a rate of speed denounced by ordinance and in violation of an ordinance requiring a bell to be sounded continuously on a moving locomotive in the city limits, and the rear end of all tenders supplied with a lantern or other light at night-time. It is alleged that defendant negligently ran its engine at twenty-five miles an hour when the ordinance prescribed a speed rate of not exceeding five; that, being dark at the time, no light was displayed on the end of the engine facing plaintiff and, hence, he could not tell whether the engine was moving or standing still; that no bell was rung or whistle sounded, nor was any other warning given; that defendant negligently failed to keep a watch for persons crossing its track at the point in question and failed to stop or attempt to stop said engine and prevent injuring plaintiff when they saw, or by the exercise of ordinary care, could have seen him on said railroad track and in a position of peril when more than two hundred feet from him and could have stopped said engine and prevented his injury if it had exercised ordinary care. It is averred, furthermore, that defendant kept a flagman at the point whose duty it was to flag trains and warn pedestrians walking across its tracks of approaching trains and engines, and said flagman negligently failed to give plaintiff any warning of the approach of said engine, and that plaintiff by said negligence was injured.

The trial began and proceeded under a petition drafted on the theory there was no public street at the point of the accident but that there was a well-marked and well-used path there leading to the Missouri river bridge, the Krug packing house and elsewhere, and for many years many persons with the knowledge and consent of defendant were licensed to use said path-

way as pedestrians and did constantly use the same in crossing and recrossing defendant's tracks and that said path crossed the line of what would have been Fifth street if it had been projected farther north. At the trial, however, the petition was amended so as to aver that the point of the accident was in Fifth street itself, and the trial concluded on the latter theory.

The answer admitted defendant's incorporation, denied the other allegations and pleaded plaintiff's contributory negligence.

The replication tendered the general issue on new matter.

The facts uncovered below are as follows:

Fifth street runs north and south, and defendant maintains two main-line tracks there side by side, called herein the east and the west track, on the east one of which the accident happened. At the *locus* the Rock Island railroad crosses defendant's two tracks from east to west at right angles. Side by side with the Rock Island track, and a little south of it, the Grand Island railroad crosses defendant's tracks at right angles. This immediate spot is called the "crossing." The rectangle made and bounded by these four tracks is called the "box." To the northeast of this box, in the angle made by the east rail of the east track of defendant with the north rail of the Rock Island track, is a little house, a few feet from either track, known as a watch-house, switch shanty, or (in railroading idiom) "the dog house." This switch shanty was used by a flagman in the employ of defendant. Defendant's east track is on a down grade from north to south—so much so that cars or engines would run of their own momentum from, say, two blocks north, to several blocks south of the switch shanty. Because of this switch shanty and certain buildings and obstructions north of it, a person approaching the crossing from the east, until past the shanty, could not be seen by those running an engine when at a distance north of the crossing on the east

track, nor could such person, so fixed, see aught of the engine except its smoke and smokestack. One of plaintiff's witnesses, east of the switch shanty and a few feet behind plaintiff, looked to the northwest and saw the smoke and smokestack of the engine in question when it was about one hundred and fifty feet north of the crossing and says at that time he could see it was running south.

At a point, estimated at about one hundred and fifty feet north of the switch shanty, was a "stop-post" where engines going south were required to stop and to call the crossing signal with two blasts of the whistle. The flagman, if the track be clear, then gave the crossing signal and the engine came on over the crossing.

At the very time of plaintiff's injury, it is agreed on all sides that a freight train, headed south on defendant's west track, was either passing the crossing with its rear end not quite over, or else the rear end had just gone by — plaintiff's witnesses say the latter, defendant's the former.

The morning of December 4, 1900, was frosty and frost lay on the rails. A few minutes before seven o'clock (the time of the accident), it is described by one of plaintiff's witnesses as a dull-looking morning, and by plaintiff himself as "a little dark." It may be said to have been at that uncertain time of dawn between daybreak and sunup at that season of the year, aptly described by the witnesses as not very dark and not yet day — as between daybreak and day. The condition of the light is further characterized by the fact that headlights were still being used on engines and lanterns for train signals, and yet it was light enough to see an object as large as an engine with the naked eye distinctly two blocks away. For instance, Miss Cook, one of plaintiff's witnesses, says there was no light displayed on the front end of the engine striking plaintiff, and yet she saw the engine plainly two blocks

away as she was walking between the east and west tracks facing it, herself going north at an hour when workmen were wending their several ways to their places of daily toil and she could tell it was moving. Plaintiff was fifty years old, and testified he had good eyesight, only used glasses for reading, and had good hearing. He worked at a packing house situate southwest of said crossing and had worked there for a score of years. The testimony shows that at this early morning hour, trains and engines were constantly passing the crossing and plaintiff knew the fact and was familiar with the crossing, having long passed there daily to and from work.

At the time in hand, plaintiff had come from his home on Sixth street, to the northeast of this crossing, across lots, as we infer, on a continuation of the path referred to, and got as far as this switch shanty and a little south or southwest of it and a very few feet from defendant's east track. Some of his fellow-workmen were also there at the time. According to his story, he stood there some little while waiting for a heavy freight train to pass south on the west track, and when the caboose got by, he started to cross the east track southwestwardly towards the packing house. He had generally seen the flagman at other times standing there, when a train was due, signal the oncoming train. Sometimes he had seen him stop a man and tell him not to cross before the train. Sometimes he heard him tell such man to go fast and get over the track. But this morning he saw no flagman and heard none. He does not say he looked to see a flagman and discovered none, but merely that he saw none and that he did not look into the watch-house because the door was closed. The witness testified through an interpreter and may be allowed to tell his story in his own words. In explanation of his testimony, it may be said that there was a building, estimated at, say, a block north of the

crossing, used as a beer warehouse and called a "brewery." Attending to the story of plaintiff, it is as follows:

"Did you stop before you went across the track, to look to see whether or not there was an engine? A. He said he walked on the other track and he saw it coming, but he got off.

"Q. Saw what coming? Ask him whether or not he looked to see whether there was an engine, and where it was before he started across? A. He said he saw the engine coming, but it was a good distance, and he don't know whether it was north or south; he said up close to the brewery. . . .

"Q. You mean this Anheuser-Busch warehouse up there? A. Yes, sir, that is the building.

"Q. Where was the engine with reference to this warehouse when you started across the track? A. He said he don't know exactly; he said it was kind of dark and he just noticed that it was close to that brewery.

"Q. Could you tell whether it was running or standing still? A. He said he could not say whether it was moving or still standing.

"Q. What time of day was it when you started across there? A. It was about fifteen or twenty minutes to seven in the morning.

"Q. Was it daylight or dark? A. He said it was kind of dark yet.

"Q. Ask him whether or not there was any light on the engine? A. He didn't see any.

"Q. Was there any light there, did he look? Did you look for any light on the engine? A. He said when he looked he didn't see any light.

"Q. Which way did the engine come from that hit you? A. From that brewery, or from that warehouse.

"The Court: Ask him how far it is from that warehouse up to this watch-house, or 'dog house,' as he calls it? A. About three hundred feet.

"Q. Did the engine that hit you ring any bell or

blow any whistle? A. They never done either one of them.

"Q. Which way was it facing, north or south, the engine? A. He said he could not say because he got scared, and didn't pay no attention which way the engine was facing.

"Q. Was it running backward or forward? A. He said he could not tell.

"Q. Did you look up the track to see the engine before you started to cross? A. Yes, he said he saw it along by that wareroom.

"Judge Culver: He said he saw what? A. That engine.

"Q. Why did you attempt to cross? A. He thought that he could make it.

"Q. Was there anything up and down the track to keep the people on the engine from seeing you? A. He didn't see anything.

"Q. Is the track straight? A. Straight.

"Q. Was it level? A. Yes, sir.

"Q. What happened to you, Mr. Mockowik? A. He got hurt in his feet and legs.

"Q. How did you get hurt, what hit you? A. The engine.

"Q. Did you ever measure the distance from the warehouse here to the dog house? A. He said he never measured it.

"Q. Did the engine stop just before it crossed the tracks, if you know? The interpreter: At the same time the engine struck him whether it stopped?

"Q. Just before it struck him. After it started here on the run down there did it stop before it struck him? A. He said he could not say whether he did or not.

"Q. Where were you with regard to being inside or outside of the last rail here when the engine struck you? A. He was just one step and he would have got outside of the track."

On cross-examination he testified thus:

"Q. Now, when you came up to the dog house did you stop, or did you walk right onto the track? A. He said there was one train passed, and he stopped at the dog house.

"Q. Where was the train passing? A. He went down south.

"Q. What track was that train passing on? A. On the second track from the guard house.

"Q. Now, how long did you stop there at the shanty? A. He said he has got no watch, he could not tell; probably he was three minutes, and probably five minutes; he could not tell.

"Q. Were you struck on the same track that the engine was on which you saw up toward the Anheuser-Busch warehouse? A. On the same track.

"Q. Now, when did you see this engine up the track, when you first came up to the dog house and stopped? A. He just looked and started to walk; he saw the train standing there, or coming, he did not know which, and then he went on.

"Q. Did you see that engine that struck you when you first came up and stopped at the dog house? A. No, sir; he saw him after he started from the dog house.

"Q. Did you look for an engine when you first came up and stopped at the dog house? A. No, sir.

"Q. Did you look more than once up that track, to see if there was an engine there? A. He said he just looked and seen it there, and that was all.

"Q. Ask him whether he looked more than once? Did you look more than once? A. Just once.

"Q. How long did you look at it, just glance at it and glance away? A. He said he just kind of glanced and went on and never paid any more attention, I suppose.

"Q. Why did you try to cross after you saw the engine on that track? A. Well, he said that he thought he could make it very easy before she would get there.

"Q. Did you run across the track, or walk across it? A. He said like he would generally go to work, just walked."

On further cross-examination, he said he was standing about two or three steps from the east track when he first saw the engine and he made four steps after he saw it and got caught on the fifth; that he only crossed the track — did not walk on it (south?); never looked for the engine after he stepped on the track or tried to hurry. "Only that he looked at it, saw it and that was all, and never paid no more attention to it and went along." The following question was asked plaintiff: "Q. Could you have seen the engine all the time it was coming?" To this he answered, through an interpreter: "He only saw him coming and that was all. He never paid any attention to it."

It seems there had been a former trial of the case at Savannah, a neighboring county seat. At that trial one Klopinski was the interpreter, as one Klossnik at this. Plaintiff, being interrogated as to his testimony at the Savannah trial, stated he had an argument with Klopinski while testifying as to whether he saw the engine one hundred feet away or one hundred steps; that he told Klopinski it was one hundred steps, but Klopinski got it one hundred feet. As part of defendant's case, counsel put on the stand the stenographer of the Savannah trial, and having proved by her that she reported the trial correctly and that the transcript shown her was correct, introduced plaintiff's testimony at that trial and thereby it appeared he had testified as follows:

"Q. Did you see an engine or train on the track anywhere before you stepped on the railroad track, and if so where was it? A. Yes, I saw the train.

"Q. Where was it, how far away from the place called the dog house? A. About a hundred feet.

"Q. Do you know where the brewery is located,

north of the dog house? A. About a hundred feet from there.

"Q. With respect to the brewery, where was the engine when you first saw it? A. About fifty feet from the brewery.

"Q. Was it north or south of the brewery? A. South.

"Q. About fifty feet south of the brewery? A. Yes, sir.

"Q. Do you know whether or not the engine was moving at that time? A. I can't say whether it was in motion or not. . . .

"Q. When you first started across the tracks what is the next thing you know with respect to your injury? A. I was scared and I don't know myself what was up.

"Q. Did you see the engine before it struck you and after you got on the track? A. I saw the engine a hundred feet but I couldn't say whether it was running or standing still.

"Q. Did you see the engine any more after you stepped on the tracks? Did you look at it any more? A. No more than when I stepped on there the engine struck me. . . .

"Q. When you first stepped on the railroad track and saw the engine up the track how far south of the brewery was the engine at that time? A. One hundred feet. I can't say exactly because it was in the corner there about a hundred feet south of the brewery. . . .

"Q. Is your eyesight good? A. Yes. sir.

"Q. Is your hearing good? A. Yes, sir.

"Q. On the morning of this injury as you were going to work did you stop at any time after you left Sixth street until you were injured? A. I walked right straight from home to my work.

"Q. You didn't stop between Sixth street and the railroad tracks? A. I went straight through.

"Q. Did you stop when you came to the railroad

track or did you keep on walking? A. I crossed right over.

"Q. You didn't stop at all? A. I didn't stop at all.

"Q. Where were you when you first saw the engine on the track north of the brewery? A. I was right at the dog house, a hundred feet.

"Q. What is a hundred feet? A. I was right at the dog house.

"Q. Were you just stepping on the track when you saw the engine or did you see it before you stepped on the track? A. I saw the engine before I stepped on the track.

"Q. Where was the engine when you saw it before you stepped on the track? A. I don't know, just the same as I said before I saw it there.

"Q. Why don't you know? A. I saw the engine but I couldn't say whether it was moving or not.

"Q. Where was the engine when you saw it? A. About a hundred feet.

"Q. Why don't you know whether it was moving or standing still? A. I can't tell that.

"Q. Why can't you tell? A. I can't tell that, whether it was in motion or not.

"Q. You didn't pay enough attention to tell that? A. I just wanted to cross over when it struck me.

"Q. I am talking about when you saw the engine first before you stepped on the track. Did you pay enough attention to it then to know whether it was standing still or moving? A. I don't know anything until it struck me.

"Q. Do you mean to say that you didn't pay enough attention to that engine to be able now to say whether it was standing still or moving. A. I couldn't.

"Q. You couldn't? A. No, sir.

"Q. Now you just glanced up there and saw the engine and then you paid no more attention to it? A.

I saw the engine and made a *run* across the track and it struck me.

"Q.  Did you see it any more except that one time, that one time when you glanced up before you started across the track?  A.  Just once.

"Q.  Just once?  A.  Yes, sir.

"Q.  You never looked towards the engine any more until you was struck.  You saw the engine before you started across the track and then you never looked towards it any more until you was struck?  A.  No, I just tried to cross the track and it hit me.

"Q.  How many steps did you take after you saw the engine before you was struck by it?  A.  I don't know whether I made one step or two.

"Q.  Why do you think the engine was a hundred feet away from you when you saw it?  A.  A hundred feet.

"Q.  Did you ever measure the ground?  A.  I have crossed there so often that I just give my judgment it was a hundred feet from there."

Having introduced evidence from other witnesses tending to show that the engine was backing down without a light displayed, that it was running at the rate of twenty-five miles an hour over the crossing, that it ran two hundred and fifty feet while plaintiff was taking as many as two steps, that no bell was rung or whistle blown, that it did not stop at the stop-post for the crossing, that after it struck plaintiff and broke his left leg and crushed the heel of his right foot and otherwise mauled and maimed him, it ran for one hundred and fifty or two hundred feet further south before it stopped, that many people continually crossed the track at that point every day, commencing early in the morning, that plaintiff was struck just as he had his foot raised to take the last step off the track, that plaintiff was sidewise to the engine when struck and whirled about and caught the hand-hold above the footboard and clung thereto, that the flagman was not in sight —

plaintiff introduced other evidence, some of it tending to show that there was no switchman on the front footboard and, *contra,* tending to show there was a man on the footboard, and further evidence tending to show that the men on the engine were all in the cab and making a great noise laughing and hallooing, and one or two witnesses conjectured they were drunk. Plaintiff also offered evidence tending to show that on a dry track, properly equipped, an engine going at five miles an hour could be stopped in seventy-five feet; ten miles an hour, in twice that distance, and so on down in proportion. By still other evidence, plaintiff showed that an engine and tender running twenty-five miles an hour could be stopped in one hundred feet under favorable conditions; at fifteen miles an hour, in sixty or sixty-five feet; and at five miles an hour in twenty or twenty-five feet.

Plaintiff introduced two or more ordinances of the city of St. Joseph tending to establish the averments of his petition relating to a five-mile rate of speed and commanding the bell on moving engines to be continuously rung and a going engine to be equipped with lights in the nighttime on the forward end. But plaintiff was neither inquired of as to whether he knew of the existence of such ordinances, nor did he testify that he knew of them or in anywise relied on such ordinances, or on defendant's obedience thereto for his protection in crossing the track at the time.

In addition to evidence showing by estimate that many hundreds of people crossed said tracks at said hour daily, plaintiff introduced a plat of Ege's second addition showing Fifth street platted to a few feet north of this crossing, and that the "box" and all tracks at the *locus* were in the platted street. In this connection it may be said that said portion of Fifth street, if by plat dedicated to public use, was shown to be a mere paper street. Besides that it was a *cul-de-sac* or pocket projecting into private grounds and ending in such.

There was no evidence of the formal acceptance of the plat or that any public work had been done on that part of the street. It was wholly occupied by railroad tracks, no horse vehicles of any sort were used on it, and no sidewalks, curbing, or other *indicia* of public user existed beyond the use indicated by pedestrians as aforesaid.

Defendant's evidence tended to prove that the engine stopped at the stop-post and called for the crossing signal; that thereupon the flagman signaled with his lantern for it to come on; that attached to the engine was a car intended for a mill known as Hominy Mill, which mill was reached by a switch about a block south of the crossing; that, intending to make a stop at this switch and the grade being down hill, the engineer put on steam, when signaled to come on by the flagman, to gather momentum to reach the switch; that about fifty feet or so north of the crossing steam was shut off and the engine, tender and car were proceeding south by their own momentum and gravity, at, say, six miles per hour; that the engine was running with its forward end to the south and which end was equipped with a going coal oil headlight (the kind then in use on switch engines on defendant's road); that a switchman with a lantern was on the west side of the front footboard in the proper position to readily signal the engineer, who was also on the west side in the cab; that the engineer was at his post of duty and attentive to his duty; that the fireman was attending the fire; that the engineer, because of the projection into the cab of the butt end of the boiler and his position west of said butt end on the right hand of the cab, could not see a person approaching the track from the east, *i. e.*, the left-hand side, south of the switch shanty at the time such person reached the track when the engine was closer than fifty or so feet north of the spot; that the bell was ringing by an automatic appliance known as a "power-ringer," an appliance manipulated by a throttle and run by

steam at that time, or air; that the engineer, though looking ahead, did not see plaintiff at all; that when a few feet, say fifteen or twenty, from the crossing he got a lantern signal to stop from the switchman on the front footboard; that at once he used every appliance for stopping and did make the earliest practicable stop in fifty or sixty feet; that the flagman's duty, as assigned him by defendant, pertained to the passage of trains and engines and to the avoidance of collisions at the crossing, but that incidentally, as a matter of humanity, he warned footmen whom he saw in peril; that at and for a distance of a block or so north and south of the *locus* people crossed defendant's tracks at all hours of the day, but that there were cinders and no well-marked pathway; that the switchman on the engine, so at his post of duty, first saw plaintiff when about to step on the track; that he hallooed to him and instantly gave a signal to stop; that the engine caught him east of the drawhead, *i. e.*, east of the middle of the track; that plaintiff grabbed for the handhold and the switchman grabbed for him, and got him around the neck and held him until the engine stopped. That plaintiff was thus saved from death is indicated by his own testimony at Savannah where he testified he was scared and did not know whether he was held up by others' aid, but when the engine stopped he realized somebody had hold of him. By other witnesses, defendant showed the flagman was standing close to plaintiff as he started across the track; that, as he got on the track immediately before the engine, the switchman and flagman saw him and hallooed, and others did the same, but plaintiff seemed not to hear and was struck almost instantly. It was shown, furthermore, that the train crew were on duty all night, were sober and had not been drinking.

Defendant also introduced an ordinance permitting it to run its trains on the streets of St. Joseph at a rate of ten miles an hour.

Mockowik v. Railroad.

In this condition of the record, plaintiff assigns for error certain rulings, *nisi,* in that the court admitted in evidence the ten-mile ordinance, in that the court refused certain instructions prayed by plaintiff, in that the court modified an instruction asked by plaintiff and in that the court erred in giving defendant's instructions, including one based on the ten-mile ordinance.

But, in the view we take of this case, before it becomes proper to consider said specific assignments of error, it is necessary to dispose of a larger question obtruding itself, viz., whether any error in instructions, or in introducing said ordinance and basing an instruction thereon, could materially affect the merits of this case and cause a reversal — in other words, had plaintiff (because of his own negligence) any case to go to the jury upon? To this larger question is due the foregoing full statement of facts and to it we now address ourselves.

I. In determining this question defendant's testimony, where controverted, must be set to one side; because plaintiff in its consideration is entitled not alone to the full force of all uncontroverted facts, but to the full force of all his controverted evidence, and is to be allowed every reasonable and favorable inference of fact deduced from all the evidence and, hence, if there can be two views of his conduct entertained by fair-minded men, one condemning and one exonerating him, he was entitled to the verdict of a jury on his contributory negligence. If, however, there was but one view to be entertained by reasonable men of his conduct, and that view adverse to him, the question resolves itself into a matter of law; and in this case the error complained of in the admission in evidence of the ten-mile ordinance merges itself into error complained of in an instruction based on that identical ordinance. Hence, the whole assignment of error, considered in the light of right reason, would seem to be error predicated of

the giving and refusing of instructions and nothing else.

II.   By express statute (R. S. 1899, sec. 865), we are forbidden to reverse the judgment of any court unless we believe error was committed against appellant materially affecting the merits of the action.   In establishing a working theory for the administration of this rule of written law, it has become the accepted doctrine that where a court, giving a wrong reason, arrives at a right conclusion its conclusion will not be disturbed. [Burnetta v. Marceline Coal Co., 180 Mo. l. c. 251; Bick v. Tanzey, 181 Mo. l. c. 526.]

Similarly, where a jury arrive at a just verdict, though the court held out a false light to them, or threw dust in their eyes (or, to use the warlike metaphor of one of plaintiff's learned attorneys, "let us go to the jury but shot our legs off before we got there") by bad instructions, yet it may not be disturbed.   [Baustian v. Young, 152 Mo. l. c. 325; Cass County v. Bank, 157 Mo. l. c. 137; U. S. Mtg. & Tr. Co. v. Crutcher, 169 Mo. l. c. 458; Swope v. Ward, 185 Mo. l. c. 329; Moore v. Railroad, 176 Mo. l. c. 545, and cases cited.]

The same rule is applied in a kindred matter, to-wit, granting a new trial.   [Emmons v. Quade, 176 Mo. l. c. 28-9.]

In the case at bar the learned trial court placed upon the jury the burden of passing upon plaintiff's contributory negligence as a question of fact when, in our opinion, under the facts in judgment such course was too gracious, for that it resolved itself into a question of law and should have been decided as such and against plaintiff.   Hence, the verdict (being right) should not be held for nought because voluntary, *i. e.*, one not coerced by a mandatory instruction of the court, nor because of errors, if any, in the instructions.

III.   We say the question of contributory negligence resolved itself into a question of law, and this

is so because, conceding to plaintiff there was evidence tending to show the engine was backing south without a light displayed, without a bell rung or a whistle being blown, and conceding to appellant, furthermore, that the place was one where respondent (because running in a dedicated street, or because of the presence of factories and a well-worn path and other evidence of the long and constant user thereof by foot-travelers) had no right to expect a clear track, but, *e converso,* stood charged with the duty of looking out for people in danger on its tracks and with the duty of exercising ordinary care not to injure them; conceding, moreover, that the engine was running at a speed denounced by ordinance of the city and that the flagman was absent from his post of duty, yet there can be but one opinion among reasonable men on the question of plaintiff's contributory negligence. And this, because:

(a) He was familiar with the tracks and was of mature judgment, with hearing good and eyesight good. On the top of this, it was at an hour when engines and trains to his knowledge were in frequent passage, and, what is still more to the point, it was a time in the morning when, though not full daylight, yet the sensible use of his eye could not only detect the presence of an engine on the track at a distance from the crossing, but also would detect its motion and the direction of that motion. That he saw the engine, stands admitted; that he saw it in motion and coming on, is a fair inference from his testimony; but that he could have seen it in motion, and in motion toward him, had he taken a steady and deliberate look, *i. e.,* used ordinary care instead of resting on a hasty and imprudent "glance" and "paying no further attention," is beyond the peradventure of a doubt. In this condition of things, the negligent absence of headlight, of bell ringing, of whistle blowing and of flagman is not deemed in the law the proximate cause of an ensuing injury. The object of headlight, bell, whistle and flagman is to announce

the presence of an engine and danger. When the traveler sees the engine, and, being *sui juris,* must be held to know the danger, notice to him serves no purpose in the law. [Murray v. Railroad, 176 Mo. 183; McManamee v. Railroad, 135 Mo. l. c. 449; Moody v. Railroad, 68 Mo. l. c. 474.]

(b)  It needs no citation of authority to sustain the proposition that there was an imperative duty resting upon plaintiff to act with reason and common sense and to look out for his own safety when about to cross defendant's track. He was charged with the duty of looking and listening, provided that by looking he could see and by listening he could hear. The law does not excuse those persons of mature years who have eyes and see not and ears and hear not. [Green v. Railroad, 192 Mo. 131; Schmidt v. Railroad, 191 Mo. 215.]  And where one from a place of safety negligently moves to a place of danger from a going locomotive so immediately before the locomotive that those controlling it, who see him in danger, may not save him by the exercise of ordinary care, the injury is not actionable; for the negligence of defendant on the above hypothesis and the negligence of the injured party are concurrent, *i. e.,* coincident in time and place. [See authorities supra; also, Kelsay v. Railroad, 129 Mo. 362; Campbell v. Railroad, 175 Mo. l. c. 183-4; Boyd v. Railroad, 105 Mo. 371; Moore v. Railroad, 176 Mo. l. c. 544, and cases cited; Walker v. Railroad, 193 Mo. 453.]

(c)  Nor under the record facts of this case can the unlawful rate of speed be fairly considered the proximate cause of the injury. [Green v. Railroad, supra; Schmidt v. Railroad, supra.]

In fact, it would seem from his own testimony that this unfortunate plaintiff foolishly shook dice with danger and lost on the throw; for in his testimony at Savannah he says he made a "run" to get across, and in his testimony at the last trial he said he "thought he could make it."

IV. Learned counsel somewhat rely upon the proposition that plaintiff had the right to presume that defendant was obeying the ordinances and governed his actions accordingly. Considering this insistence, it may be said this is not a case where the accident happened in the nighttime and where plaintiff could not see and advise himself by the exercise of ordinary care of the presence, let alone the speed of the engine. Nor is this a case where plaintiff was killed, so that what he knew and what he relied on as controlling his conduct died with him, and hence could not be shown. In such case as that because of the presumption of a love of life and because of a presumption that a rational being would take ordinary care to avoid danger, the law in its blandness indulges other presumptions, and one of them is that it will be presumed that the decedent trusted, as he had a right to trust, that defendant was running its engine in obedience to speed ordinances and that such decedent regulated his movements accordingly. [Hutchinson v. Railroad, 161 Mo. l. c. 254, and cases cited; Riska v. Railroad, 180 Mo. 168; Weller v. Railroad, 164 Mo. 180; Sullivan v. Railroad, 117 Mo. 214.] But will the law indulge presumptions where all parties to the actual occurrence are alive and go upon the stand and the facts are fully disclosed? If plaintiff knew of the ordinances and relied on the fact that defendant was obeying their provisions and acted on that reliance, could he not have said so? Under such conditions, reliance would seem to be a fact susceptible of proof as are other facts, and should be proved by the best evidence of which the case would admit. He of all men knew what the facts were, and, having declined to speak, may he invoke the aid of friendly presumptions? "Presumptions," as happily stated by a scholarly counselor, *ore tenus,* in another case, "may be looked on as the bats of the law, flitting in the twilight but disappearing in the sunshine of actual facts." That presumptions have no place in the presence of the actual

facts disclosed to the jury, or where plaintiff should have known the facts had he exercised ordinary care, is held in many cases, of which samples are, Reno v. Railroad, 180 Mo. l. c. 483; Nixon v. Railroad, 141 Mo. l. c. 439; Bragg v. Railroad, 192 Mo. 331. To give place to presumptions, on the facts of this case, is but to play with shadows and reject substance.

It results from these views that the judgment should be affirmed. Accordingly, it is so ordered.

*Brace, P. J.,* and *Valliant, J.,* concurring; *Graves, J.,* not sitting.