## JULIA A. STOTTLER, Respondent, v. WABASH RAILROAD COMPANY, Appellant.

### St. Louis Court of Appeals, March 3, 1914.

1. **RAILROADS: Death of Pedestrian at Crossing: Implied Invitation to Cross.** In an action for the death of a pedestrian at a railroad crossing, by being caught between two cars which were coupled together while he was attempting to pass between them, evidence that the space between the two cars, through which decedent attempted to pass, was four or five feet in width and that the engine and a car attached thereto were standing still and blocked the regular crossing when he approached, *held* not sufficient to sustain the theory that an implied invitation was extended to pedestrians to leave the sidewalk and pass through the opening.

2. ———: **Crossing Accident: Contributory Negligence.** Everyone is required to look and listen for approaching railroad trains before going upon the track, and especially must one look and listen before attempting to pass between cars standing thereon.

3. ———: **Death of Pedestrian at Crossing: Contributory Negligence.** In an action for the death of a pedestrian at a railroad crossing by being caught between two cars which were coupled together while he was attempting to pass between them, evidence *held* to show that decedent was negligent in attempting to pass through the opening, in that, either he did not look before going between the cars, or if he did, and saw, as he must, that the engine was in the act of starting, or about to do so, he failed to heed what he thus saw.

4. **NEGLIGENCE: Presumptions: Exercise of Care.** The presumption that every person exercises ordinary care for his own safety is dispelled when the facts concerning his situation appear to rebut it.

5. **RAILROADS: Death of Pedestrian at Crossing: Contributory Negligence: Presumption.** In an action for the death of a pedestrian at a railroad crossing by being caught between two cars which were coupled together while he was attempting to pass between them, it could not be presumed, in order to exonerate decedent from the charge of contributory negligence, that he looked before going between the cars, conformably to the general presumption that everyone exercises due care for his own safety, where it appeared that if he did look he must have seen the danger of going between the cars.

Appeal from Montgomery Circuit Court.—*Hon. James D. Barnett,* Judge.

REVERSED.

*J. L. Minnis, N. S. Brown* and *Smith & Johnson* for appellant.

(1) The demurrer to the evidence should have been sustained, because: (a) The evidence shows that the deceased was guilty of contributory negligence. Stillson v. Railroad, 67 Mo. 671; Hudson v. Railroad, 101 Mo. 13; Gurley v. Railroad, 104 Mo. 211; Corcoran v. Railroad, 105 Mo. 399; Stites v. Knott, 197 Mo. 684; Wherry v. Railroad, 64 Minn. 415; O'Mara v. Canal Co., 18 Hun. (N. Y.) 192; Flynn v. Railroad, 83 Wis. 238; Bertelson v. Railroad, 5 Dak. 313; Memphis, Etc., Railroad v. Copeland, 61 Ala. 376; Railroad v. Dewey, 26 Ill. 255; Railroad v. Coss, 73 Ill. 394; Howard v. Railroad, 41 Kan. 403; Lewis v. Railroad, 38 Md. 588; Bird v. Railroad, 86 Mich. 79; Railroad v. Pinchin, 112 Ind. 592; Southern R. R. v. Clark (Ky.), 105 S. W. 384; Wallace v. Railroad, 165 Mass. 236. (b) The evidence failed to establish any negligence on the part of the engineer of the defendant. Stillson v. Railroad, supra; Stites v. Knott, supra; Railroad v. Bednorz, 57 Ill. App. 309; Railroad v. Cline, 111 Ill. App. 416. (c)

Even though the engineer was negligent in failing to ring the bell, the concurring and contributory negligence of the deceased bars a recovery. Corcoran v. Railroad, 105 Mo. 406; McGee v. Railroad, 214 Mo. 545; Dey v. Railroad, 140 Mo. App. 461.

*John M. Barker, James L. Barker* and *E. Rosenberger & Son* for respondent.

STATEMENT.—This is a suit by plaintiff, a widow, under the wrongful death statute, for damages accrued on account of the loss of her husband through the alleged negligence of defendant. Plaintiff recovered and defendant prosecutes the appeal. Plaintiff's husband came to his death through being caught and crushed in the couplers while passing between a refrigerator car and a box car, with locomotive attached, on defendant's switch track at Wellsville, Missouri.

We copy from the brief of plaintiff (respondent) the full statement of facts prepared by her counsel, which, in the main, is supported by the evidence in the record introduced on her behalf. However, the statement that a number of persons passed through the opening between the cars before Mr. Stottler came to his death is not supported by the evidence, though it appears one man, Mentz, did so. Neither is the statement touching the near proximity of the east end of the refrigerator car to the Second street crossing correct. The evidence is conclusive that the east end of the refrigerator car stood about sixteen feet to the northwest of the sidewalk crossing and therefore the statement that Mr. Stottler walked from five to eight feet between the poultry house and the empty box car before stepping into the opening between the box car and the refrigerator car is not entirely accurate. It is clear the distance so walked by plaintiff's husband between the poultry house and the empty box car before stepping between the cars was more than from five

to eight feet and probably more than eleven feet, for it is certain on the evidence that the two cars stood not more than five feet apart. The evidence on the part of plaintiff is that the first door in the poultry house was thirty-two feet, eight inches northwest of the northwest side of the sidewalk crossing and that the east or southeast end of the refrigerator car as it stood on the track was about half way between the northwest side of the sidewalk and such door. Therefore, this distance is about sixteen feet. The evidence most favorable to plaintiff, concerning the distance between the refrigerator car and the box car, which was moved against Mr. Stottler and occasioned his death, is that such distance was from four to five feet. This being true, it is entirely clear that Mr. Stottler, plaintiff's husband, walked between the poultry house and the box car for as much as eleven feet, at any rate, before he could possibly have entered between the cars, and it may be that he walked twelve or fourteen feet after leaving the sidewalk before entering the fatal aperture where he was crushed in passing through.

Plaintiff's statement of the facts is as follows:

"Julia A. Stottler, surviving widow of William Stottler, instituted this action against the defendant, alleging that her husband's death occurred through defendant's negligence on December 16, 1909.

"The facts may be briefly summarized as follows:

"Wellsville is a town of about twelve hundred population, and a city of the fourth class. The tracks of the defendant pass through the town of Wellsville in a northwesterly and southeasterly direction. The tracks of the defendant are crossed by a number of streets in the city of Wellsville, one known as Second street, which runs in a northeastwardly and southwesterly direction. Second street is one of the principal thoroughfares of Wellsville. The defendant maintained three tracks where Second street crosses the tracks of the defendant. The track on the extreme

north is the main track. The first track to the south of the main track is called the passing track, and the third track to the south, the last track, is sometimes referred to as 'Blattner Brothers' switch,' 'the switch track,' 'the hill track,' or 'the poultry house track.'

"On the northwest side of Second street and running parallel with Second street is a sidewalk. This sidewalk runs up from the south to the Blattner Brother' switch track and at that point the pedestrians cross the three tracks of the defendant. The Second street crossing and the sidewalk crossing had been used for a great number of years by the public in general. Immediately south of the Blattner Brothers' switch track, at a distance of about five feet, and immediately to the northwest of the sidewalk which ran along the northwest side of Second street is situated Blattner Brothers' poultry house.

"Between Blattner Brothers' poultry house and Blattner Brothers' switch track there is a cinder path. On the day in question, about the hour of 11:30 a. m., one of defendant's freight trains, east bound, stopped at Wellsville for the purpose of picking up some cars off of Blattners' switch track. There were four cars on Blattners' switch track standing alongside the poultry house. The two cars farthest west were loaded cars, which were to be taken off of the switch tracks and attached to the east-bound train. The car immediately in front of the two loaded cars was an empty refrigerator car, and the car immediately east of the refrigerator car was an empty Wabash box car. When the train stopped on the main track, the locomotive without any cars attached, was run down the main track in an easterly direction, backed up in a westerly direction on Blattners' switch track, and was coupled onto the four cars, the engine being coupled onto the empty Wabash box car. After this coupling was made the engine proceeded down east onto the main track. The two loaded cars were detached and shunted back

on the main line. The engine with the two empty cars attached was then run in a westerly direction along Blattners' switch track. The car immediately to the west which was being pushed was the empty refrigerator car, and the car between the engine and the refrigerator car was the empty Wabash box car. The refrigerator car was stopped and placed at a point so that the east end of the refrigerator car was from ten to fifteen feet northwest of the southeast corner of Blattner Brothers' poultry house. When the refrigerator car had been stopped at that point the depot agent stuck his head out of the depot window—the depot being located some distance northwest of the poultry house, and on the north side of the main track —and told the trainmen to 'spot' the refrigerator car further west. By the time this order of the agent had been communicated to the men in charge doing the switching, the empty Wabash box car drawn by the locomotive had already been cut off and detached from the refrigerator car, and the locomotive was going in an easterly direction, and was stopped at a point southeast of the sidewalk, which crosses Second street.

"The engineer then reversed his engine and backed the engine and the empty box car which was attached to the engine in a westerly direction, and pushed the empty Wabash box car across Second street and across the sidewalk, and then stopped the engine, leaving the west or northwest end of the empty Wabash box car standing about five to eight feet west or northwest of the southeast corner of Blattner Brothers' poultry house. This movement of the train not only obstructed Second street crossing, but it also obstructed the sidewalk crossing, and the one which was used by pedestrians. This left an open space of from four to five feet between the bumper on the west end of the empty Wabash box car and the bumper on the east end of the refrigerator car, and this open space was from five to eight feet west of the sidewalk crossing.

"There is a conflict in the evidence as to whether the empty box car, as it was being backed towards the refrigerator car after the engine was put in backward motion, was ever stopped, and if so, for what length of time. The contention of the defendant, appellant, is, that the evidence shows that, after the engine was placed in backward motion, it never stopped and that the empty Wabash box car which was pushed westwardly never stopped until the empty Wabash box car was pushed against the empty refrigerator car. On the other hand, plaintiff, respondent, contends that the evidence shows that the box car was stopped dead still for a considerable length of time, and that it obstructed the Second street crossing and the sidewalk crossing immediately to the northwest of Second street and that the opening thus left was an invitation to pedestrians using the crossing to pass through the opening and that a number did so.

"The deceased, William Stottler, on the morning that he met his death had come to town to deliver some hogs. He had weighed up the hogs at the scales, which were situated some distance south of the poultry house. As he left the scales Stottler came around the southwest corner of the poultry house and commenced walking on the sidewalk in a northeasterly direction, the sidewalk being on the northwest side of Second street. Seeing that the crossing was obstructed when he reached the corner of the poultry house and noticing the opening between the empty box car and the empty refrigerator car, Stottler turned the corner of the poultry house, walked a distance of from five to eight feet, between the poultry house and the empty box car, stepped in between the opening left between the empty box car and the refrigerator car, and as he was in the act of passing between these cars, the engine was put in backward motion. This caused the empty Wabash box car to close in upon him. He was caught between the bumpers of the two cars, mashed and crushed in

the abdomen, and in a few minutes thereafter, after having been removed to the doctor's office, died, without making any statement.

"The evidence on behalf of plaintiff showed that a number of persons had passed and repassed through the same opening that Stottler was attempting to pass through when he was killed. At the time Stottler met his death, he was closely following one Leo Mentz, who had just passed through this opening going at an ordinary gait. The undisputed testimony showed that the engineer in charge of the engine was at his post of duty on the right hand side of the cab, which was on the south side of the engine; that his view was unobstructed and that he had a full view of Stottler as Stottler passed around the corner of the poultry house and started to go in between the openings of the two cars. It is a significant fact that the engineer, although brought to the trial by defendant, was not placed upon the stand. The testimony of plaintiff further shows that, when the box car was backed up towards the refrigerator car, and before Stottler was caught, no warnings or signals of any kind were given by the engineer in charge of the engine, that no whistle was sounded, and that no bell was rung.

"The plaintiff recovered judgment for five thousand dollars, and defendant, after unsuccessful motions for a new trial and in arrest of judgment, has duly perfected its appeal."

In addition to the above statement and to further elucidate the subject-matter, other facts will be stated as follows:

The evidence relied upon to support the statement that several persons passed to and fro between the refrigerator car and the box car immediately prior to plaintiff's husband's being crushed is that of Mr. Lowry, a witness for plaintiff. This witness testified that he was standing in the street, but southeast of the sidewalk and to the southwest of the corner of Blatt-

ner's poultry house, near a telephone pole, in conversation with Mr. Blattner when defendant's locomotive was doing the switching—that is, setting a car in adjacent to the poultry house; that the locomotive pushed the refrigerator car in, detached the box car from it, and moved to the eastward across the street, when it was stopped, reversed, and backed up a second time and stopped again with the Wabash box car attached to it, obstructing the sidewalk crossing on the northwest side of the street. He did not see plaintiff's husband go between the cars, for his view was obstructed by the poultry house building. After plaintiff's husband was crushed, the witness aided in removing him from the point where he fell "about half-way between the corner of the building and the first door."

The witness then testifies as appears from the questions and answers: "Q. After you ascertained it was Mr. William Stottler, did you then recall at any time that when you and Mr. Blattner were standing on the corner that Mr. Stottler passed by you? A. Well, I couldn't say, there were several passed by. Q. What became of these several persons that were passing; did you notice what became of them—where did they go? A. No, I didn't notice where they went." It is clear enough that this evidence does not show that several persons passed to and fro through the opening between the two cars where Mr. Stottler was crushed, for the street was not closed all of the time and the persons passing may have continued across in the usual way. Especially is this true in view of the conceded fact that the locomotive was moving backward and forward with but one car attached and that only a portion of the time was the street crossing blocked on that account. It appears from the evidence introduced by both plaintiff and defendant that one stop was made by the engine when the car attached was twenty or thirty feet out in the street and the crossing was then free to those desiring to use it. It is

true the witness Leo Mentz came along from the south-west on Second street immediately before plaintiff's husband and on approaching the crossing found it was blocked by the Wabash box car attached to the engine. He thereupon turned to the northwest and passed along the narrow space about three feet in width between Blattner Brothers' poultry house and the box car, crossing the switch track by turning to the northward through the aperture between the box car and the refrigerator car standing on the switch. This refrigerator car had been set in there, as the evidence discloses, but a few moments before, by the same locomotive, when it was disconnected or uncoupled from the Wabash box car. This witness, Mentz, says the two cars were about four or five feet apart when he passed through and he does not think the box car was moving. But *immediately* upon passing through, he turned around to watch the trainmen "spot" the car—that is, set it in place—and saw plaintiff's husband, Mr. Stottler, caught between the couplers. The witness says that he subsequently made a calculation with a watch to ascertain the time consumed by him in passing through between the cars and found it was about three seconds. All of this evidence was introduced on the part of plaintiff.

On the part of defendant, the evidence tends to prove that the locomotive was engaged in switching as above described—that is to say, that it came in upon the Blattner sidetrack, took out four cars, which were standing there, in order to get the two loaded cars farthest to the northwest. After having coupled on to the four cars, the locomotive proceeded southwest over the switch and on to the main line, where it stopped and then took on a backward movement by which the two loaded cars were shunted on to the main line. Having gotten these loaded cars on the main line where they could be reached and placed in the train for St. Louis, the locomotive then started backward

again on the Blattner switch to set the two remaining cars of the four adjacent ·to the poultry house from whence they had been taken. The car attached to the locomotive is said to have been a Wabash box car, while the remaining car of the two was the refrigerator car. These two cars were slowly pushed backward by the locomotive across Second street, when the refrigerator car was uncoupled immediately northwest of Second street and permitted to stop, as all the evidence shows, about sixteen feet northwest of the sidewalk. In other words, as the witnesses identify it, the east or southeast end of the refrigerator car stood about half way between the sidewalk and the first door of the poultry house adjacent to the track. The distance from the outer edge of the sidewalk of the crossing to this door is admitted ·to be thirty-two feet and eight inches. Having stopped the refrigerator car at this point, the locomotive proceeded to the east or southeast until it had crossed the entire width of Second street and the order came from the conductor to return and "spot" the refrigerator car. The locomotive stopped immediately and, it is said, proceeded to back slowly, with the bell sounding all the time, until plaintiff's husband was crushed at the coupling.

It appears from all of the evidence in the case that the movement of the cars proceeded in the ordinary way, at least no witness says that any long continued stoppage in the process of switching occurred at any time or at any place. But the evidence on behalf of plaintiff tends to show that there was one, if not two, short stops made while the locomotive with the Wabash box car alone was operating in and across the street and that this box car was standing across the sidewalk crossing when plaintiff's husband approached and turned to the northwest through the narrow space between the poultry house and the car, with a view, no doubt, of passing around the end of the box car and between it and the standing refrigerator car to the

northeast side of the tracks. The witness, Leo Mentz, was, according to the evidence, but a few feet in advance of plaintiff's husband and passed through the same route, but safely, arriving on the north side just in time to look around and see Mr. Stottler caught between the couplers and crushed. Mentz was a resident of Wellsville, familiar with the location, and says he was in a hurry to return to his work at the store where he was engaged as a clerk. It appears that Mentz did not know Mr. Stottler was immediately behind him and it is to be inferred that Mr. Stottler passed along the narrow path between the poultry house and the Wabash box car with a view of crossing the track through the aperture between that and the refrigerator car because he saw Mentz pursuing that course immediately before him. Other evidence on the part of defendant is to the effect that its brakeman, Archer, who was near, called out to both Mentz and plaintiff's husband not to attempt to pass through between the cars and attempted to catch hold of the deceased to prevent his doing so but failed to reach him, but it is obvious from the instructions given the jury rejected this evidence and found the fact to the contrary.

NORTONI, J. (after stating the facts).—The averments of negligence relied upon in the petition go to the effect that defendant moved the locomotive and box car backward as plaintiff's husband was about to pass through the aperture between the car attached to the engine and the refrigerator car, without giving any warning as by sounding the bell or otherwise. The last chance or humanitarian doctrine is not counted upon in the petition and, indeed, it does not appear that plaintiff's husband might have been saved if his dangerous situation was discovered by those in charge of the locomotive. Neither is an ordinance of the city relied upon, but the case proceeds, as stated, on the the-

ory alone that defendant had blocked the street crossing with its car and locomotive and left an opening between the cars near the crossing which operated as an implied invitation to persons on the street to leave the thoroughfare and pass through such opening. It is to be conceded that, on the most favorable view of the evidence for plaintiff, the locomotive and car were standing still and the crossing thus blocked when plaintiff's husband approached. But the evidence by no means sustains the theory that an implied invitation was extended to pedestrians to leave the sidewalk and pass to the northwest between the poultry house and the box car and then on through the opening between the two cars. [Touching that matter, see Stillson v. Hannibal, etc. R. Co., 67 Mo. 671, 677.] Then, too, it is obvious the car had stood at rest but a moment or two at most or a very short time. Ordinarily it would be difficult to perceive wherein a charge of negligence could be sustained against defendant in a case of this character, for it is not required to anticipate as within the range of reasonable probabilities that persons will leave the sidewalk in the public street and wend their way through a narrow passage to cross the track in its private switch yards between standing cars. But plaintiff introduced one of defendant's rules in evidence requiring the bell on the locomotive to be sounded whenever an engine was moved, and the train men admit on the witness stand that this obligation obtained in the instant case. It may be that this rule inured to the benefit of plaintiff's husband, though it does not appear he knew of it at the time and relied thereon; or this may not be true. We decline to examine and decide that question, for the case is to be disposed of on other grounds, even if defendant was negligent at the time.

Though it be conceded that defendant were negligent in not sounding the bell before moving the en-

gine and the box car backward, as it is said the evidence for plaintiff tends to prove, no one can doubt that if plaintiff's husband was careless of his own safety at the time and that such carelessness or negligence on his part concurred proximately with that of defendant in causing the injury from which he died, then no recovery may be allowed. [See Corcoran v. St. Louis, I. M. & So. R. Co., 105 Mo. 399, 16 S. W. 411.] Here, it appears that defendant's husband was negligent beyond question. On no view of the case may it be said that he took such precautions for his own safety, before going between the cars, as usually attend the conduct of an ordinarily prudent man, when it is remembered that the law requires one *sui juris*, possessing all his faculties, to see or hear that immediately before him, and charges him with knowledge of those dangers existing in his very presence, and especially so when approaching such a dangerous situation as the crossing between standing cars, with locomotive attached, in the company's private yards. The evidence is, that plaintiff's husband was an alert, intelligent man, possessed of good eyesight and hearing. His faculties were in no wise impaired or different from that of the average man of his age—about sixty-eight years. Then, too, there was no long train of cars and the attendant circumstances connected with such involved in the case, for it appears from all of the evidence he was required to look out for but one car and locomotive attached to it. The length of the box car attached to the engine, it is said, was about thirty-six feet, and the locomotive of the size and pattern now in common use. It was obvious to him, as it was to all others, that the locomotive was engaged in switching and dealing with cars about the poultry house. Every witness in the case states such to be the fact, though at the very moment when plaintiff's husband left the sidewalk and walked to the opening between the cars, both the box car and the engine were at rest.

The aperture between the two cars and through which plaintiff's husband sought to pass was, according to the evidence most favorable to her, from four to five feet. And the witness Mentz passed through it immediately before the decedent. He stopped on the other side to see the car moved backward or "spotted," as he says, simultaneously with plaintiff's husband's being caught between the cars and, according to the evidence of this witness, who testified for plaintiff, but three seconds were consumed by him in passing between the cars. Obviously plaintiff's husband was not more than three seconds behind him in point of time, and this being true, must have turned between the cars about the time the backward movement of the box car commenced. No witness says he did not do so and the evidence of plaintiff's witness, Mentz, reveals as much to be true, for he says, upon completing the passage through, "I looked back when Mr. Stottler was being caught between the couplers." All of the witnesses say the car moved backward slowly and not at high speed, and the witness Mentz states the couplers were then just "easing up" against Mr. Stottler's abdomen and he was turning his body to the southeast as though to squeeze through.

No one can doubt that railroad tracks are an ever present signal of danger, and especially is this true when one attempts to pass between cars standing thereon with locomotive attached. [See Dyrcz v. Mo. Pac. R. Co., 238 Mo. 33, 47, 141 S. W. 861; Gurley v. Mo. Pac. R. Co., 104 Mo. 211, 16 S. W. 11.] Because of this fact one must always look and listen for approaching trains before entering thereon, and especially is this true in the circumstances of the instant case, for the cars are present at hand in the railroad private yards where switching is usually in progress and within a foot or two at most of the party and the entire train, consisting of car and locomotive, all within the range of his vision.

But it may be said that no witness testified plaintiff's husband did not look and listen, and the proposition of fact thus stated is true.   Neither does any one say he did so look or listen.   But the law indulges a presumption to the effect that every person conducts himself in accordance with the precepts of ordinary care for his own safety.   [See Buesching v. Gas Light Co., 73 Mo. 219; Wack v. St. Louis, I. M., etc. R. Co., 175 Mo. App. 111, 157 S. W. 1070.]   Although such be true, this presumption is by no means conclusive, for it may be dispelled in every case when the facts concerning the situation of the party appear to rebut it.   [Mockowik v. Kansas City, etc. R. Co., 196 Mo. 550, 571, 572, 94 S. W. 256.]   Here the presumption may not obtain in aid of the plaintiff, for it is certain that had Mr. Stottler looked and listened before stepping between the cars he would have observed the immediate danger at hand.   On the other hand, if we allow the benefit of the presumption to plaintiff and treat her husband as having looked and listened immediately before turning between the cars, no recovery may be allowed, for the law charges him with the knowledge of that which was open and obvious at the time.   The hour when plaintiff's husband went between the cars was about 11:30 in the forenoon and no obstruction whatever existed between him and the locomotive attached to the southeast end of the box car. He walked along beside the car from the sidewalk and at most was not more than one or two feet from it at any time, for the pathway between the car and the poultry house was only three feet in width.   Had he turned and looked toward the locomotive, before entering upon the track, or even at the box car beside him, he must have recognized the presence of danger, for all the evidence shows it was either in the act of starting or about to do so.   The physical facts alone con-

·clude the matter. In such circumstances our Supreme Court has but recently said on this question:

"Moreover, given daylight and no obstructions, given a situation where to look is to see, then such person is conclusively held to see; for on that hypothesis looking is equivalent to seeing. Hence, for one to say . . . that he did not see an engine bearing down upon him and so close to him as to strike him as he crossed the track, is precisely the same as if he had said he did not look at all. No judgment should stand on an impossibility; for· example, on the fact that one saw around a corner with a naked eye, or through a solid stone wall, or in broad day looked and ·did not see a locomotive engine hard by on a straight and unobstructed track." [Dyrcz v. Mo. Pac. R. Co., 238 Mo. 33, 47, 141 S. W. 861.] It is clear that plaintiff must be denied a recovery because of the concurrent negligence of her husband which at least co-operated proximately to his injury.

The judgment should be reversed. It is so ordered. *Reynolds, P. J.*, and *Allen, J.*, concur.